THE UNITED STATES *ex rel.* THE ATTORNEY GENERAL OF THE UNITED STATES *v.* DELAWARE AND HUDSON COMPANY.

SAME *v.* ERIE RAILROAD COMPANY.

SAME *v.* CENTRAL RAILROAD COMPANY OF NEW JERSEY.

SAME *v.* DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY.

SAME *v.* PENNSYLVANIA RAILROAD COMPANY.

SAME *v.* LEHIGH VALLEY RAILROAD COMPANY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

THE UNITED STATES, APPELLANT, *v.* DELAWARE AND HUDSON COMPANY.

SAME *v.* ERIE RAILROAD COMPANY.

SAME *v.* CENTRAL RAILROAD COMPANY OF NEW JERSEY.

SAME *v.* DELAWARE, LACKAWANNA AND WESTERN RAILROAD COMPANY.

SAME *v.* PENNSYLVANIA RAILROAD COMPANY.

SAME *v.* LEHIGH VALLEY RAILROAD COMPANY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF PENNSYLVANIA.

Nos. 559, 560, 561, 562, 563, 564, 565, 566, 567, 568, 569, 570. Argued January 19, 20, 1909.—Decided May 3, 1909.

Although a limitation to its operation might be reasonable and thus assuage the radical results of a prohibitory statute, if it is not expressed in the statute, to engraft such a limitation would be pure

judicial legislation. In construing the commodities clause of the Hepburn Act the suggestion of the Government to limit its application to commodities while in the hands of a carrier or its first vendee, and, as thus construed, extend the indirect interest prohibition to commodities belonging to corporations the stock whereof is owned in whole or in part by the carrier, or those which had been mined, manufactured or produced by the carrier prior to the transportation, cannot be accepted.

The duty of this court in construing a statute which is reasonably susceptible of two constructions, one of which would render it unconstitutional and the other valid, to adopt that construction which saves its constitutionality (*Knights Templar Indemnity Co.* v. *Jarman*, 187 U. S. 197) includes the duty of avoiding a construction which raises grave and doubtful constitutional questions if the statute can be reasonably construed so as to avoid such questions. *Harriman* v. *Interstate Com. Comm.*, 211 U. S. 407.

This rule applied to the commodities clause of the Hepburn Act so as to avoid deciding the constitutional questions which would arise if the clause were construed so as to prohibit the carrying of commodities owned by corporations of which the carrier is a shareholder, or which it had mined, manufactured or produced at some time prior to the transportation.[1]

---

[1] The grave constitutional questions which the court could not have avoided answering by adopting the construction contended for by the Government are as follows (see p. 406, *post*):

1. Whether the power of Congress to regulate commerce embraces the authority to control or prohibit the mining, manufacturing, production or ownership of an article or commodity, not because of some inherent quality of the commodity, but simply because it may become the subject of interstate commerce.

2. If the right to regulate commerce does not thus extend, can it be impliedly made to embrace subjects which it does not control, by forbidding a railroad company engaged in interstate commerce from carrying lawful articles or commodities because, at some time prior to the transportation, it had manufactured, mined, produced or owned them, etc.?

Also as necessarily involved in the determination of the foregoing questions:

*a.* Did the adoption of the Constitution and the grant of power to Congress to regulate commerce have the effect of depriving the States of the authority to endow a carrier with the attribute of producing as

Where ambiguity exists it is the duty of a court construing a statute to restrain the wider and doubtful provisions so as to make them accord with the narrow and more reasonable provisions and thus harmonize the statute.

A prohibition in an act of Congress will not be extended to include a subject where the extension raises grave constitutional questions as to the power of Congress, where one branch of that body rejected an amendment specifically including such subject within the prohibition.

In the construction of a statute the power of the lawmaking body to enact it, and not the consequences resulting from the enactment is the criterion of constitutionality.

The provision contained in the Hepburn Act approved June 29, 1906, c. 3591, 34 Stat. 584, commonly called the commodities clause, does not prohibit a railway company from moving commodities in interstate commerce because the company has manufactured, mined or produced them, or owned them in whole or in part or has had an interest direct or indirect in them, wholly irrespective of the relation or connection of the carrier with the commodities at the time of transportation.

The provision of the commodities clause relating to interest, direct or indirect, does not embrace an interest which a carrier may have in a producing corporation as the result of the ownership by the carrier of stock in such corporation provided the corporation has been organized in good faith.

Rejecting the construction placed by the Government upon the commodities clause, it is decided that that clause, when all its provisions are harmoniously construed, has solely for its object to prevent carriers engaged in interstate commerce from being associated in

---

well as transporting particular commodities, a power which the States from the beginning have freely exercised, and by the exertion of which governmental power the resources of the several States have been developed, their enterprises fostered, and vast investments of capital have been made possible?

*b.* Although the Government of the United States, both within its spheres of national and local legislative power, has in the past for public purposes, either expressly or impliedly, authorized the manufacture, mining, production and carriage of commodities by one and the same railway corporation, was the exertion of such power beyond the scope of the authority of Congress, or, what is equivalent thereto, was its exercise but a mere license, subject at any time to be revoked and completely destroyed by means of a regulation of commerce?

interest at the time of transportation with the commodities transported, and it therefore only prohibits railroad companies engaged in interstate commerce from transporting in such commerce commodities under the following circumstances and conditions:

*a.* When the commodity has been manufactured, mined or produced by a railway company or under its authority and at the time of transportation the railway company has not in good faith before the act of transportation parted with its interest in such commodity;

*b.* When the railway company owns the commodity to be transported in whole or in part;

*c.* When the railway company at the time of transportation has an interest direct or indirect in a legal sense in the commodity, which last prohibition does not apply to commodities manufactured, mined, produced, owned, etc., by a corporation because a railway company is a stockholder in such corporation. Such ownership of stock in a producing company by a railway company does not cause it as owner of the stock to have a legal interest in the commodity manufactured, etc., by the producing corporation.

As thus construed the commodities clause is a regulation of commerce inherently within the power of Congress to enact. *New Haven Railroad* v. *Interstate Commerce Commission*, 200 U. S. 361. The contention that the clause if applied to preëxisting rights will operate to take property of railroad companies and therefore violate the due process provision of the Fifth Amendment, having been based upon the assumption that the clause prohibited and restricted in accordance with the construction which the Government gave that clause is not tenable as to the act as now construed which merely enforces a regulation of commerce by which carriers are compelled to dissociate themselves from the products which they carry and does not prohibit where the carrier is not associated with the commodity carried.

The constitutional power of Congress to make regulations for interstate commerce is not limited by any requirement that the regulations should apply to all commodities alike, nor does an exception of one commodity from a general regulation of interstate commerce necessarily render a statute unconstitutional as discriminating between carriers; and the exception of timber in the commodities clause of the Hepburn Act does not render the act unconstitutional, nor can the question of the expediency of such an exception affect the question of power.

Where, as in this instance, the provision for penalties is separable from the provisions for regulations, the court will not consider the question of the constitutionality of the penalty provisions in a suit brought

by the Government to enjoin carriers from violating the regulations and in which no penalties are sought to be recovered.

As the construction now given the act differs widely from the construction which the Government gave to the act and which it was the purpose of these suits to enforce, it is not necessary in reversing and remanding, to direct the character of decrees which shall be entered, but simply to reverse and remand the case with directions to enforce and apply the statute as it is now construed.

Although the Delaware and Hudson Company may originally have been chartered principally for mining purposes, as it is now engaged as a common carrier by rail in the transportation of coal in the channels of interstate commerce, it is a railroad company within the purview of the commodities clause and is subject to the provisions of that clause as they are now construed.

164 Fed. Rep. 215, reversed.

THE facts which involve the constitutionality and construction of the commodities clause of the Hepburn Act, § 1, c. 3591, act of June 29, 1906, 34 Stat. 584, are stated in the opinion.[1]

*The Attorney General* and *The Solicitor General,* with whom Mr *L. Allison Wilmer* and *Mr. Thomas C. Spelling* were on the brief, for the United States:

The question of the reasonableness of a statute is for the legislature, but the clause in question is a reasonable exercise of the power of Congress.

If a statute pertains to a subject exclusively committed to Congress, the statute is within the scope of constitutional power; this statute is within the scope of power conferred by the Con-

---

[1] "From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest direct or indirect except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier."

stitution. *The Lottery Case,* 188 U. S. 321, 357; *Northern Securities Co.* v. *United States,* 193 U. S. 197, 344; *The Daniel Ball,* 10 Wall. 557, 566;

Congressional non-action lends no color of authority or validity to state regulations of anything properly pertaining to interstate commerce. *Leisy* v. *Hardin,* 135 U. S. 100, 109, 110–122; *Addyston Pipe & Steel Co.* v. *United States,* 175 U. S. 216, 229, 232; *Crandall* v. *Nevada,* 6 Wall. 35, 48, 49; *Houston* v. *Moore,* 5 Wheat. 23; *Union Bridge Co.* v. *United States,* 204 U. S. 364, 386. When the Federal power has been exercised, it is, by the express terms of the Constitution, the exercise of the supreme will, and the state regulation must, in so far as there is a conflict, give way. *Gibbons* v. *Ogden,* 9 Wheat. 1, 196, 199; *McCulloch* v. *Maryland,* 4 Wheat. 422; *Asbell* v. *Kansas,* 209 U. S. 251, 254; *Leisy* v. *Hardin,* 135 U. S. 100, 109; *Houston* v. *Moore,* 5 Wheat. 1, 23; *Brown* v. *Maryland,* 12 Pet. 446; *Groves* v. *Slaughter,* 15 Pet. 448, 510, 511; *New York* v. *Miln,* 11 Pet. 102, 157–159.

Not even a State, still less one of its artificial creations, can stand in the way of the enforcement of an act of Congress constitutionally passed under its authority to regulate commerce. *Northern Securities Co.* v. *United States,* 193 U. S. 197, 333; *McCulloch* v. *Maryland,* 4 Wheat. 427, 429, 432, 435; *Cohens* v. *Virginia,* 6 Wheat. 264, 385, 414.

Corporations created by the States are as much subordinate to the powers of Congress, in the regulation of interstate commerce, as if they had been created by acts of Congress. *Hale* v. *Henkel,* 201 U. S. 43, 75.

If a State can by the creation of a corporation and by conferring upon the corporation certain powers forestall the operation of subsequent Federal laws before their enactment, the provision in the Constitution that laws made pursuant to its provisions shall be the supreme law of the land, may be at any time nullified. See *Union Bridge Co.* v. *United States,* 204 U. S. 364; *Henderson* v. *Mayor of New York,* 92 U. S. 259, 272; *Railroad Co.* v. *Husen,* 95 U. S. 471.

The prohibitions contained in this statute do not prevent its constituting legislation which Congress may enact under the commerce clause of the Constitution.

Congressional power over commerce among the States is analogous to the same power over foreign commerce. *Crutcher* v. *Kentucky*, 141 U. S. 57; *Brown* v. *Houston*, 114 U. S. 622, 630; *Gibbons* v. *Ogden*, 9 Wheat. 1, 192.

The recognized powers as to foreign commerce, such as laying an embargo as to products of other nations in a time of peace, and the power to forbid and punish introductions of coins of foreign nations, illustrate Congressional power to forbid transportation of commodities from State to State, under circumstances requiring such prohibition in the national interest. *United States* v. *Marigold*, 9 How. 560, 566.

Interstate railroads are peculiarly subject to regulation, by reason of their performance of public functions and duties. They are vested with public rights to enable them to serve public interests as common carriers, and Congress has the power to divorce their public duties as such public servants from their private interest in carrying their own products. *New Haven R. R.* v. *Interstate Com. Comm.*, 200 U. S. 361; *Cherokee Nation* v. *South Kansas R. R. Co.*, 135 U. S. 657.

The question of the reasonableness or of the wisdom of the enactment is not for the courts but for the legislature. *Silz* v. *Hesterberg*, 211 U. S. 31, 40; *State* v. *Hyman*, 98 Maryland, 618, 619; *City of Baltimore* v. *Radecke*, 49 Maryland, 217, 229, 230.

Arguments *ab inconvenienti* are not to be considered unless the language of the act be ambiguous. *Ex parte Kearney*, 7 Wheat. 38, 44; *Beardstown* v. *Virginia*, 76 Illinois, 34; *Greencastle* v. *Black*, 5 Indiana, 557; *Smith* v. *Thursby*, 28 Maryland, 244; *Henshaw* v. *Foster*, 9 Pick. (Mass.) 312, 316; *Gage* v. *Currier*, 4 Pick. (Mass.) 399.

The courts are not at liberty to declare an act void because in their opinion it is opposed to a spirit supposed to pervade the Constitution but not expressed in its words. Cooley,

Const. Lim. (5th ed.) 205; *People v. Fisher,* 24 Wend. 215, 220; *State* v. *Staten,* 6 Coldw. (Tenn.) 238; *Walker* v. *Cincinnati,* 21 Ohio St. 14; *People v. Rucker,* 5 Colorado, 455; *Commonwealth* v. *McCloskey,* 2 Rawle, 374.

The presumption is in favor of validity, and only when the question is free from reasonable doubt will the Supreme Court hold an act of Congress to be in violation of the Constitution. *Nicol* v. *Ames,* 173 U. S. 509; *Fletcher* v. *Peck,* 6 Cranch, 126.

For protection against unjust or unwise legislation, within the limits of recognized legislative power, the people must look to the polls and not to the courts. It would be an abuse of judicial power for the courts to attempt to interfere with the constitutional discretion of the legislature. *Covington Bridge Case,* 105 U. S. 470, 482; *The Lottery Case,* 188 U. S. 321; *Joint Traffic Association Case,* 171 U. S. 505, 573; *Northern Securities Case,* 193 U. S. 337; *Beebe* v. *State,* 6 Indiana, 501, 528; *Johnston* v. *Commonwealth,* 1 Bibb, 603; *Flint River Steamboat Co.* v. *Foster,* 5 Georgia, 194; *State* v. *Kruttschnitt,* 4 Nevada, 178; *Walker* v. *Cincinnati,* 21 Ohio St. 14; *Hills* v. *Chicago,* 60 Illinois, 86; *Ballentine* v. *Mayor &c.,* 15 Lea, 633; *State* v. *Traders' Bank,* 6 So. Rep. 582.

If power exists, it is to be assumed that legislative discretion has been properly exercised. Cooley, Const. Lim. (6th ed.,) 220; *People* v. *Lawrence,* 36 Barb. 177; *People* v. *N. Y. Cent. R. Co.,* 34 Barb. 123; *Baltimore* v. *State,* 15 Maryland, 376; *Goddin* v. *Crump,* 8 Leigh, 154; *Soon Hing* v. *Crowley,* 113 U. S. 703.

The prevention of monopoly has long been a legitimate object of legislation. *Pearsall* v. *Great Northern R. R. Co.,* 161 U. S. 646, 676; *Northern Securities Case,* 193 U. S. 341. Far stronger reasons, referable to a well-founded fear of monopoly, exist for prevention of a union of ordinary occupations, such as trading and producing, with transportation, by railroad corporations, than can be urged against consolidations such as were forbidden in the *Northern Securities Case.*

The term "commerce," as used in the Constitution, embraces the instrumentalities by which commerce is carried on.

*Northern Securities Co.* v. *United States*, 193 U. S. 197; *Railroad Co.* v. *Fuller*, 17 Wall. 500, 508; *Pensacola Tel. Co.* v. *Western Union Tel. Co.*, 96 U. S. 1; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 203. When a railroad is engaged, as are the roads owned by the defendants, in interstate commerce, it is necessarily an instrumentality of interstate commerce. When, therefore, they entered into such combinations as are shown in this case, such restrictive arrangements gave them the essential character of contracts, combinations, or conspiracies in restraint of trade or commerce, whereby the defendants monopolized, or attempted to monopolize, trade or commerce among the several States or with foreign nations. *Coxe Brothers & Co.* v. *Lehigh Valley Railroad Co.*, 4 I. C. C. Rep. 468; *New Haven R. R.* v. *I. C. C.*, 200 U. S. 392, 393; *United States* v. *Freight Association*, 166 U. S. 290, 333, 334; *Joint Traffic Association Case*, 171 U. S. 577; *Addyston Pipe Case*, 175 U. S. 211, 244.

The highways of commerce are, in a sense, the public property of the Nation and subject to all the requisite legislation by Congress, which necessarily includes the power to keep them open and free from any obstruction, and Congress has, in this regard, all the powers that existed in the States before the adoption of the Constitution. *Gilman* v. *Philadelphia*, 3 Wall. 713, 724; *In re Debs*, 158 U. S. 564, 586.

These combinations between state corporations, one or more being industrial and the other a common carrier, would be amenable to a state law formulated in like terms as the Anti-Trust Act. *People* v. *Chicago Gas Trust Co.*, 130 Illinois, 294; *People* v. *North Riv. Sug. Ref. Co.*, 54 Hun (N. Y.), 377. And if such combinations interfere with the laws of free competition in interstate commerce, and cannot be effectively dealt with under the anti-trust act, Congress can provide another and more effective remedy. *Sturgis* v. *Crowninshield*, 4 Wheat. 122; *McCulloch* v. *Maryland*, 4 Wheat. 315; *United States* v. *Fisher*, 2 Cranch, 358, 396; *Juilliard* v. *Greenman*, 110 U. S. 440, 441; *In re Jackson*, 14 Blatch. 250.

The law here in question does not violate the guarantees of the Fifth Amendment, nor any other constitutional guarantees. The prohibition of the so-called commodities clause is not arbitrary as that word is defined in the decisions of this and other courts. *Gulf, Col. & S. F. Ry.* v. *Ellis*, 165 U. S. 150, 155; *A., T. & S. F. R. R.* v. *Matthews*, 174 U. S. 96; *Clark* v. *Kansas City*, 178 U. S. 114; *Tullis* v. *Lake Erie & Western R. R.*, 175 U. S. 348; *Orient Ins. Co.* v. *Daggs*, 172 U. S. 557.

It cannot be said that this statute is on its face a deprivation of life, liberty or property without due process of law, in the sense in which the phrase is ordinarily used. It is as proper an exercise of power under the commerce clause to forbid, conditionally, shipments of a certain class or description as to forbid discrimination. See *Joint Traffic Association Case*, 171 U. S. 571; *Addyston Pipe Case*, 175 U. S. 211. When the fundamental law has not limited, either in terms or by necessary implication, the general powers conferred upon the legislature, the court cannot declare a limitation under the notion of having discovered something in the spirit of the Constitution which is not even mentioned in the instrument. *People* v. *Fisher*, 24 Wend. 215, 220. To the same effect are *State* v. *Staten*, 6 Coldw. (Tenn.) 238; *Walker* v. *Cincinnati*, 21 Ohio St. 14; *State* v. *Smith*, 44 Ohio St. 348; *People* v. *Rucker*, 5 Colorado, 455; *Whallon* v. *Ingham*, 51 Michigan, 503; *Wooten* v. *State*, 5 So. Rep. 39; *Cochran* v. *Van Surlay*, 20 Wend. 365, 381, 383; *People* v. *Gallagher*, 4 Michigan, 244; *Benson* v. *Mayor &c.*, 24 Barb. 248; *Grant* v. *Courter*, 24 Barb. 232. The clause does not violate the provision that no person shall be deprived of property without due process of law. When it is claimed that a legislative act is inhibited by the due process clause, as applied to property, there must be an interest amounting to a vested right of property. If a right claimed is not of that character, then it is merely an inchoate right—a privilege. Rights are vested when the right to enjoyment, present or prospective, has become the property of

some particular person or persons, as a present interest. 8 Cyc. L. & Proc., 894; Cooley, Const. Lim. 438, 465; *Pearsall* v. *Great Northern R. R. Co.*, 161 U. S. 646, 673. No right can be vested as a result of action which invades the domain of congressional power to regulate commerce, whether Congress has already acted or yet withholds action on the subject. Cooley, Const. Lim. (6th ed.) 437, 438; *Fitzgerald* v. *Grand Trunk R. R. Co.*, 63 Vermont, 169; *S. C.*, 13 L. R. A. 70; *Union Bridge Case*, 204 U. S. 364.

Retrospective Federal laws, unless *ex post facto*, are not within the due process clause or any other prohibition of the Constitution, however repugnant to the principles of sound legislation. *Stephens* v. *Cherokee Nation*, 174 U. S. 445; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420; *Satterlee* v. *Mathewson*, 2 Pet. 380; *Bonaparte* v. *Camden*, Baldw. 205; *S. C.*, Fed. Cas. No. 1617; *Bennett* v. *Baggs*, Baldw. 60; *S. C.*, Fed. Cas. No. 1319; *Albee* v. *May*, 2 Paine, 74; *S. C.*, Fed. Cas. No. 134.

No valid argument can be based upon long acquiescence in the use made of their coal lands and their output by the railroads on the part of the United States; for no estoppel can be asserted against constitutional legislation. *Louisville & Nashville R. R. Co.* v. *Kentucky*, 161 U. S. 677, 689; *Union Bridge Co.* v. *United States*, 204 U. S. 364; *Bridge Company* v. *United States*, 105 U. S. 470.

Not only is the Government not barred by acquiescence in what the defendants have done, whether with or without state authority, but Congress could not have bartered away or estopped itself to exercise any of its constitutional powers. *Monongahela Nav. Co.* v. *Coons*, 6 W. & S. (Pa.) 101; *Susquehanna Canal Co.* v. *Wright*, 9 W. & S. (Pa.) 9; *New York & Erie Railroad Co.* v. *Young*, 33 Pa. St. 175; *McKeen* v. *Delaware Canal Co.*, 49 Pa. St. 424; *Freeland* v. *Pennsylvania Railroad*, 66 Pa. St. 91; *Bailey* v. *Phil., Wilm. & Balt. Railroad*, 4 Harr. (Del.) 389; *Rundle* v. *Del. & Raritan Canal Co.*, 14 How. 80.

The clause does not violate the provision that private prop-

erty shall not be taken for public use without just compensation.  See *Union Bridge Co.* v. *United States*, 204 U. S. 364; Cooley, Const. Lim. (6th ed.) 473.

The commodities clause is not open to the objection that the penalties imposed for violations thereof are of such magnitude and so unduly excessive and extortionate as to be substantially destructive of the property and franchises of the carriers affected thereby, nor does it, in respect to such carriers, constitute a denial of the equal protection of the law.  Cooley, Const. Lim. 402; *Coffey* v. *Harlan County*, 204 U. S. 659, 665.

The clause does not give a preference to the ports of one State over those of another, contrary to Art. I, § 9, clause 6 of the Constitution.  *Armour Packing Co.* v. *United States*, 209 U. S. 56, 80; and see also *Pennsylvania* v. *Bridge Co.*, 18 How. 421, 435.

The clause does not deny full faith and credit to the public acts of a State contrary to Art. IV, § 1 of the Constitution.

This clause did not confer any power or jurisdiction upon the States, but merely assured the recognition of their acknowledged jurisdiction over persons and things within the respective territory of each of them.  Story, Const., § 1313; *Bissell* v. *Briggs*, 9 Massachusetts, 462, 467; *Shunway* v. *Stillman*, 4 Cowen, 292; *Borden* v. *Fitch*, 15 Johns. 121; Story, Confl. of Laws, § 609; *McElmoyle* v. *Cohen*, 13 Pet. 312; *D'Arcy* v. *Ketchum*, 11 How. (U. S.) 165.  The States of New York and Pennsylvania could no more diminish or increase or forestall Federal regulation of interstate commerce than they could bind the Nation by a treaty with a foreign government, or by a declaration of war against a friendly nation.

The clause does not deny persons any privileges or immunities of citizens of the States contrary to Art. IV, § 2, subd. 1, of the Constitution.

A corporation acquires by its charter no extraterritorial powers, immunities, or privileges, even if it were clear that this constitutional provision was intended to apply to corporations. In fact this constitutional provision has been always held a

prohibition against state, and not against Federal action, though there is nothing in this statute or in the record rendering the question relevant.

The clause does not invade the reserved rights of the people or of the States contrary to the Ninth and Tenth Amendments or any other provisions of the Constitution, nor does it deprive any person of any right of property or other right secured by § 2 of Art. IV, or by the Fifth, Eighth, Ninth, Tenth or Fourteenth Amendment, or by any other Amendment or provision of the Constitution.

This objection is yet another form of saying that the people have never conferred upon Congress the power to enact the commodities clause, or that it is not on its face a constitutional exercise of the power to regulate interstate commerce. It is only where Congressional power is claimed upon an inherent sovereignty theory, or under the general-welfare clause, that such an objection can be pertinent, as, for example, in a case like *Kansas* v. *Colorado*, 206 U. S. 46, where power was claimed for Congress to interpose in the distribution of the inland waters of a State for irrigation purposes.

No right not under protection of the prohibitions or guarantees of the Federal Constitution can be set up against an authorized regulation of interstate commerce, even though such right be given in terms by a state law. If the court finds constitutional authority for the commodities clause then no state charter can furnish to the defendant any protection or defense in an action brought for its enforcement.

No relations assumed by individuals, nor rules governing such relations *inter sese*, whether made by the individuals themselves or by a State, can stand in the way, where an issue arises between them and the Government, to prevent the enforcement of a constitutional law. The right of a State to create a corporation and vest it with certain powers does not carry with it the right to project either the powers of the State or of the corporation across state lines, and thus invade the domain of interstate commerce, which it is the sole province of Congress

to regulate and protect. *W. U. Tel. Co. v. Pendleton*, 122 U. S. 347, 357, 358.

Each State has plenary local powers over its own territory and its own corporations. But a State, while exercising state sovereignty over a corporation of its creation, cannot prevent or embarrass the exercise by Congress of any power intrusted to it by the Constitution. *Railroad Co. v. Maryland*, 21 Wall. 456, 473; *Northern Securities Co. v. United States*, 193 U. S. 197, 347. See also *Brown v. Maryland*, 12 Wheat. 419; *Passenger Cases*, 7 How. 283; *In re Debs*, 158 U. S. 564; *Lottery Case*, 188 U. S. 321; *Stockton v. Baltimore & N. Y. R. Co.*, 32 Fed. Rep. 11, 16.

The clause does not impair the obligation of contracts. Without going so far as to say that such obligations as are set forth in the answers are invalid, notwithstanding the authority and sanction of state laws, defendants will not be heard to set them up to defeat a Federal law, passed in the exercise of power constitutionally conferred. *Northern Securities Co. v. United States*, 193 U. S. 197, 347; *New Haven R. R. Co. v. Interstate Commerce Commission*, 200 U. S. 361; *Union Bridge Co. v. United States*, 204 U. S. 364; *United States v. Trans-Missouri Freight Assn.*, 166 U. S. 290; *United States v. Joint Traffic Assn.*, 171 U. S. 505, 569, 571.

All the defendant companies have an "interest" in the coal transported, within the meaning of the word "interest" as used in the statute. The interest of the companies, or any one of them, may not be a legal interest, but it is none the less real and substantial. *Humphreys v. McKissock*, 140 U. S. 304, 312; *Burton v. United States*, 202 U. S. 344.

The exception in the statute of "timber and the manufactured products thereof" from the prohibition contained in the statute, does not render the statute unconstitutional. *Connolly v. Union Sewer Pipe Co.*, 184 U. S. 540, discussed, and distinguished from this phase of the case at bar.

The contention of the defendants that they have no interest, within the meaning of the clause in question, in the coal trans-

ported by them which is mined and sold by the coal companies of which they own all, or a large part, or some part, of the capital stock, is wholly without force. The same is true of the assertion of the Delaware and Hudson Company that because of a sale of part of its coal at the mines, it is not the owner thereof when transportation begins, or at any time thereafter. Equally without merit is the contention of the Lackawanna Company that its ownership of capital stock of coal companies does not constitute an interest, direct or indirect, in the coal mined by such companies and transported over its lines of railroad.

The purpose to be attributed to Congress in enacting the statute, as well as the language of the statute itself, precludes the view that a legal interest only was referred to. The purpose of the statute, which was to be gathered from the history of the times and the conditions that were to be remedied, was to prevent discrimination on the part of railroads engaged in interstate commerce against the shippers of the country in the interest of themselves or persons or corporations under their control or in which they were interested. The idea of Congress was to free interstate transportation from the dangers arising from self-interest on the part of the carriers. The temptation to indulge in secret rebating in the transportation of coal in interstate commerce, and in other favoritism, is as great where the carrier owns a majority of the stock of a coal mining company as where it is itself directly engaged in the mining of coal. In the one case its interest in the coal is direct, in the other it is indirect, but in both cases its interest is substantially the same so far as the purpose which Congress may be presumed to have had in view is concerned. *Burton* v. *United States*, 202 U. S. 344.

A railroad company has an interest in a corporation or the property of a corporation whose stock it holds. It is true it is not such an interest as it can mortgage or assign (*Humphreys* v. *McKissock*, 140 U. S. 304, 312); it is not a legal interest, but it is none the less real and substantial. See *Pullman Car Co.* v.

*Missouri Pacific Co.*, 115 U. S. 587, 597; 4 Words and Phrases Judicially Defined, 396 *et seq.*, and cases there cited.

As to the Delaware and Hudson's claim, it is argued on behalf of that company that the statute should be read as if the word "or" in the expression "any article or commodity other than timber and manufactured products thereof, manufactured, mined, or produced by it or under its authority, *or* which it may own in whole or in part," should be read as if it were "and," so that it would not apply to the transportation by a railroad company of coal mined by it, but the title to which had passed from it. Otherwise, it is argued, it would be impossible for a railroad company to transport any coal mined by it, although title to it may have passed through several purchasers. This amounts merely to saying that the statute, as drawn, is impolitic, but the statute is to be given a reasonable construction to accomplish the purpose of Congress in its enactment. The interest that a railroad might have in transporting for the vendee, at less than the published tariff rate, coal mined by it and sold at the mines, is apparent. But ordinarily it would have no such interest in respect to the transportation of such coal for any subsequent purchaser from its vendee. The latter case would not be within the spirit and purpose of the act, although it might come within its letter.

*Mr. John G. Johnson*, *Mr. Robert W. De Forest* and *Mr. Walker D. Hines* for defendants in error and appellees. (*Mr. Johnson* and *Mr. De Forest* for defendants in error and appellees generally, *Mr. Hines* for the Delaware and Hudson Company.)

*Mr. Johnson* and *Mr. De Forest:*

The commodities clause is not applicable in the case of carriers who do not own or mine coal, but simply own shares of stock in coal companies. Under the statutes of Pennsylvania and under the decisions of that State, a railroad company does not have an interest in the coal because of its ownership of shares of stock of coal companies. See act of assembly of

Pennsylvania, approved April 26, 1855 (P. L. 329); *Commonwealth* v. *Monongahela Company*, 216 Pa. St. 114; *Shepard's Estate*, 170 Pa. St. 323; *Conley* v. *Mathieson Alkali Works*, 190 U. S. 406; *Commonwealth &c.* v. *N. Y., L. E. & W. R. R. Co.*, 132 Pa. St. 591; *Buffalo Loan, Trust & Safe Dep. Co.* v. *Medina Gas & Electric Co.*, 162 N. Y. 67, 76; *Saranac & Lake Placid R. R. Co.* v. *Arnold*, 167 N. Y. 368, 374; *Peterson* v. *C., R. I. & P. Ry. Co.*, 205 U. S. 364; *Pullman Car Co.* v. *Mo. Pac. Co.*, 115 U. S. 587.

The commodities clause is unconstitutional because its penalties are so prescribed as practically to amount to a denial of an opportunity by railroad companies to obtain a judicial determination of the questions involved. See *Ex parte Young*, 209 U. S. 147; *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 595; *Chicago Railway Co.* v. *Minnesota*, 134 U. S. 418, 456.

The commodities clause is unconstitutional because, making illegal discriminations, it is not due process of law. If the act is improperly discriminating in any vital part, it is invalid as to the whole. All the vital portions of an act constituting a whole, have mutual relation, and any failure in any one vital part destroys the entire enactment. Non-uniformity cannot be sustained because sought to be effected under the guise of a classification of that which cannot be classified. A statute of the United States, establishing a public policy, in the matter of uniformity must stand upon the same basis as a statute of a State. *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 560. The commodities clause discriminates in three important particulars: between different owners of coal, without justification; between carriers of timber and its manufactured products; between different classes of common carriers.

The commodities clause is unconstitutional because it forbids a railroad company, obeying every rule of transportation prescribed by Congress, to transport an article of commerce which not only is harmless, but is one of the necessaries of life. The act is not a regulation but a prohibition. In discussing this proposition, there is no difference between the rights of

an individual and the rights of a corporation. *Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196, 204. The *Lottery Case,* 188 U. S. 321, is not an authority sustaining the right of Congress to pass the commodities clause. In the present case, the article carried is harmful neither to morals nor to health. It is a necessity of life. The *Lottery Case* (*supra*), quoted from and discussed. As to what is included in the word "commerce," see *Gloucester Ferry Co. v. Pennsylvania,* 114 U. S. 196, 203.

Whilst prohibition of the transportation of articles injurious to health or morals is included within the idea of a regulation of commerce, a prohibition of such transportation, where the articles are necessaries of life, is not within such idea. A requirement that transportation shall be conducted without favoritism, or discrimination, and not at excessive rates, is included within a regulation. Congress may forbid contracts in restraint of trade, because such contracts interfere with commerce and indirectly regulate the same. *The Addyston Case,* 175 U. S. 211, 226.

Where articles are forbidden to be transported because the owner is engaged in the carriage of like commodities for itself as well as for others, such forbidding goes beyond the province of regulation and introduces something not within the grant of a power to regulate, *i. e.,* a condemnation of a duality of ownership and transportation which had resulted from legislation by the States, in a matter over which they had control. It practically takes away property, or at least destroys the value of property, vested in its owner by the law of the only country which can control it, *i. e.,* the State in which it is located.

Commerce does not result from any grant in the Constitution, to Congress, of power to permit or disallow the same, nor from any permission by Congress. It is an inherent right, possessed by every citizen. A prohibition, therefore, which does not regulate the right, but denies and destroys it, must rest upon a power different from that granted by a permission to regulate.

The very grant of power to regulate commerce, recognizes the existence of a right to carry it on, derived from some other, and independent, source.

The right of property is one secured to every citizen of the United States, under and against the Government, by the Constitution of the United States. This right, which, as will be probably conceded, includes that of commerce, is taken away by the commodities clause. Countless hundreds of millions of dollars of property values are destroyed at a stroke of the Congressional pen, without evidence of the existence of any necessity for such destruction.

The interstate commerce which is forbidden by the commodities clause is (1) transportation of its own products by a railroad company; and (2) sales by the citizens of one State, of their property, to citizens of another State, under certain circumstances.

Conceding the right to regulate the transportation in such way and manner as to compel it to conform to all such reasonable rules as the legislature may prescribe, the right does not exist to prohibit it where such rules are complied with. Included in this denial, is a denial of the conclusion that duality of ownership and of transportation, *ex necessitate*, amounts to violation of such rules of transportation.

Neither intercourse between the States, involving a carriage of persons or of property, nor transactions of sale and purchase, involving a delivery, can be forbidden, unless the person against whom the prohibition goes, violates some law enacted properly in exercise of the power to regulate. See *Northern Securities Co.* v. *United States*, 193 U. S. 197, 199; *Gibbons* v. *Ogden*, 9 Wheat. 1, 196; *Adair* v. *United States*, 208 U. S. 161; *Dobbins* v. *Los Angeles*, 195 U. S. 223, 236; *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447; *Ex parte Jackson*, 96 U. S. 727; *Chicago Ry. Co.* v. *Minnesota*, 134 U. S. 418, 455. Case of *Union Bridge Co.* v. *United States*, 204 U. S. 364, discussed and distinguished. The case of *New Haven Ry. Co.* v. *Interstate Commerce Commission*, 200 U. S. 361, is not an authority in

support of the contentions of the United States herein. The case is clearly distinguishable from the case at bar.

Foreign commerce is the intercourse between two countries, which, often, may be hostile. In determining the extent of, and limitations upon, foreign commerce, we have recourse to the law of nations. We find that one nation, for the protection of its citizens and its property, may put an embargo upon trade and fetter the intercourse. Were it otherwise, the nation itself might be destroyed, because of its inability to protect itself against the danger of unlimited intercourse. When, therefore, Congress regulates foreign commerce, it regulates something which has inherent limitations. The nation's protection may be involved in the exercise of a power, under certain circumstances, to bar all communication. There is no need, and no right, to forbid the citizens of one State from transferring their possessions and their persons to another.

The theory of the Government is, that Congress may destroy the existence of several branches of commerce, and regulate what remains.

Domestic commerce is very different in its nature, scope and extent. It is the intercourse between the citizens of the different States in the transportation of persons and property from one to the other. This intercourse between citizens of the different States is an intercourse of persons, all of whom are citizens of a Union, which was largely created in order to bring about unlimited intercourse, saving only to such extent as it should be found necessary to regulate the same.

It is a fundamental right of every owner of property in one State, to sell it to citizens of another State, and to have the same, when thus sold, transported. This right cannot be forbidden by Congress. However the intercourse may be regulated; such regulation must proceed upon the concession of the inability to deprive, altogether, of the right.

If Congress may forbid commerce between the States in the sense of transactions in trade in harmless articles, it may forbid intercourse between persons. It may forbid the carrier to

transport its shareholders or its directors, because it may be tempted to give them greater privileges in their carriage. *Buttfield* v. *Stranahan*, 192 U. S. 492; *Lawton* v. *Steele*, 152 U. S. 133; *Railroad Co.* v. *Richmond*, 19 Wall. 584.

The commodities clause is unconstitutional because it was intended to violate, and does actually violate, a right reserved to the States.

Any Federal statute which has for its purpose the destruction of title to property or of the enjoyment of property, title to which is vested by the law of the State in a third person, trenches upon the reserved right under the Tenth Amendment: *United States* v. *Fox*, 94 U. S. 315.

The commodities clause is unconstitutional because, in violation of constitutional restrictions upon the exercise of the right to regulate commerce, it deprives of liberty and property.

The power possessed by Congress to regulate commerce must be so exercised as not to destroy the right to dispose of property, or to make legal contracts concerning the use, or transportation, thereof.

To forbid a coal company to sell its coal to the citizens of another State, or to cause the same to be transported into such State, is to deprive it of its "liberty," because of the deprivation of the power to use its property, in accordance with its legal right. *McCray* v. *United States*, 195 U. S. 27; *Carroll* v. *Greenwich Ins. Co.*, 199 U. S. 401; *Butchers' Union Co.* v. *Crescent City Co.*, 111 U. S. 746; *Powell* v. *Pennsylvania*, 127 U. S. 678; *Monongahela Nav. Co.* v. *United States*, 148 U. S. 336; *Allgeyer* v. *Louisiana*, 165 U. S. 589.

The commodities clause is unconstitutional because it is in effect a taking of private property for public use without compensation.

An ownership of coal shares, involves the right to receive whatever benefit may result from the exercise of powers conferred by the law of the State which incorporated. Practically, to destroy the exercise of its franchises by the company, is to take its property as completely as though it was physically

seized. *Muglen v. Kansas*, 123 U. S. 623; *United States* v. *Lynah*, 188 U. S. 445; . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Mr. *William S. Opdyke*, Mr. *James M. Beck* and *Mr. Walker D. Hines* filed a separate brief on behalf of the Delaware and Hudson Company. The first point of their brief relates only to the case of the Delaware and Hudson Company: . . . . . . .

The Delaware and Hudson Company being organized primarily to produce and handle anthracite coal, and possessing its railroad powers merely as an incident to such primary purpose, is not embraced in the prohibition of the commodity clause. The Delaware and Hudson Company is a corporation whose railroad powers were granted as an incident to its industrial powers. It is a corporation organized to acquire land and mine therefrom anthracite coal and supply the same to consumers; and its railroad powers are incidental to that particular purpose. Clearly the term "railroad company" as used in the commodity clause does not apply to every corporation which operates a railroad. There are numerous industries throughout the country which operate, as incidental to their business, more or less railroad mileage. As to such mileage these corporations may be charged with the duties of a common carrier; and as business may be handled on through bills of lading such corporations would be, with respect to such matters, carriers subject to the act to regulate commerce. Yet such corporations could not, in any just sense, be regarded as railroad companies within the meaning of the commodity clause. In this class the Delaware and Hudson Company is included. The legislative history of this company shows that it is a coal company with incidental railroad functions. Unless, therefore, the expression "railroad company" in the commodity clause is to be taken as meaning every corporation of an industrial character which merely as an incident to its industrial functions operates a railroad, then the clause should not apply to this appellee. It is perfectly legitimate for an industrial corporation to promote the efficiency and economy

of its operations by the construction of railroads when legally empowered to do so. It would be a superlative injustice to treat an industrial corporation as a railroad company because of the operation of a railroad under such circumstances, and then, because the industrial corporation is so treated as a railroad company, to prohibit the industrial corporation from performing the very transportation functions which alone serve as the inducement to the operation of the railroad.

Another grave reason for not construing the clause to apply to this appellee is that such construction unnecessarily overturns a deliberate and long-settled policy jointly entered upon with respect to this appellee by the States of Pennsylvania and New York. The legislation of those two States with respect to this appellee shows a clear purpose to provide for the acquisition and mining of coal in Pennsylvania by a corporation formed for that purpose, and to provide further for the transportation of that coal to the State of New York by the same corporation. The commodity clause, if construed to apply to this company, does not merely impair, and to a large extent destroy, the rights of the individuals who have invested as bondholders and stockholders in the Delaware and Hudson, and the rights of individuals who may have contracted with that company, but the clause utterly nullifies the policy of the States of Pennsylvania and New York with reference to this corporation. An act of Congress ought not unnecessarily to be so construed as to nullify such a policy deliberately adopted and carried out by two States of the Union. The original legislation is now irrepealable by either of the two States.

To apply the commodity clause in this unnecessary manner to the Delaware and Hudson is to work a destruction of property rights of great magnitude, which have existed for nearly a century. To exclude appellee's coal from the only practical channel of interstate transportation is confiscatory, because largely destroying the value of appellee's coal and coal lands. To exclude the interstate coal traffic from appellee's railways

is confiscatory, because largely destroying the value of these railways and equipment. Such confiscation would be unconstitutional. However, even if such unconstitutionality were not clear, but were merely doubtful, it would be the duty of the court to avoid an unnecessary construction of the statute which would develop such constitutional doubts. *Harriman* v. *Interstate Commerce Commission*, 211 U. S. 407.

*Mr. George F. Brownell* and *Mr. Adelbert Moot* filed a separate brief on behalf of the Erie Railroad Company:

It is undisputed that the first predecessor of the Erie Railroad Company was organized in 1832, and that it is a stockholder in the Pennsylvania Coal Company which was authorized by a statute of Pennsylvania, in 1838, to transact the usual business of companies engaged in mining, transporting to market and selling coal, with power to purchase or lease coal lands, and to construct railroads, and that said coal company did acquire coal lands, develop mines, and enter into authorized contract relations with defendant's predecessors for the construction of railroads and the transportation of its coal to market.

The Hillside Coal & Iron Company was organized under a statute of Pennsylvania in 1869, with similar powers; and into this corporation many other coal corporations were afterwards merged, under the laws of Pennsylvania.

"Solely" to furnish an outlet, by authority of Pennsylvania and New York, this defendant's predecessors and said coal corporations, built railroads and mine branches in connection with said coal companies, to transport their coal to interstate markets; the railroads so built being duly authorized, and aggregating, in lines, branches, yards and sidings very expensive to build in the mountainous country in which they were built, about 190 miles.

These railroads will be "substantially valueless" if the defendant can no longer haul their tonnage to the usual interstate markets over its tracks, and the mines of these companies will be deprived of their only outlet to these markets, such

interstate markets being substantially their only markets for
their output.

These railroad lines, branches, sidings, and yards, built
"solely" for the accommodation of this coal business, have
little business except such coal business, and that coal business
is of such magnitude that it constitutes over 22% of the entire
freight tonnage of all the railway lines of the Erie Railroad
Company, and brings it over 20% of its revenue for transpor-
tation, and to deprive the defendant of such coal tonnage
would greatly impair, and in many cases wholly destroy, both
mines and railways.

The bondholders of this defendant and its predecessors hold
bonds aggregating upwards of $136,000,000 that rest upon
these properties, which will be greatly impaired or destroyed
if the authorized contract and stockholding relations of rail-
roads and mining corporations above described are destroyed,
as they will be if the commodities clause is upheld, and it is
held to also apply to this defendant as a mere stockholder.

This defendant is a minority stockholder in the Temple Iron
Company, some of the coal of which also reaches interstate
markets over defendant's lines, but defendant has nothing to
do with mining coal, or dealing in it, and is in no way interested
in coal mining except as "a stockholder" in the three coal
mining corporations named.

Anthracite coal is harmless and necessary fuel, and the in-
vestigation of the Anthracite Strike Commission shows there
is nothing unnatural about the present status of the business,
in view of the natural difficulties encountered, the capital nec-
essary to develop and carry it on, and the authority necessarily
given capital by the State of Pennsylvania, to cause the for-
mation of corporations to develop the expensive coal mines,
and, therefore, the present status of the business furnishes
no reason whatever for such legislation as the commodities
clause.

The present status of timber lands and lumbering, as com-
pared with coal properties and mining, furnishes no reason to

support the exemption of timber alone from the commodities clause.

The history of the commodities clause shows that it was enacted to prohibit mining according to the laws of that State, by corporations of Pennsylvania, by making it impossible for mining corporations of that State to sell in that State the coal mined, since the clause, if broadly construed, as the Government claims it should be, prohibits common carriers from carrying such coal to interstate markets upon any terms and conditions whatever, even for the lawful purchasers and consumers thereof.

The commodities clause not only vitally affects this defendant, and other railroad companies, if it is sustained as to stockholders, but it is vital to the interests of millions of citizens who are consumers of all necessary commodities, and also the stockholders and bondholders of all great industrial corporations, since they can no longer buy or sell the very necessaries of life without the consent of Congress.

That clause is unconstitutional because it is contrary to the fundamental and "unalienable" rights of citizens reserved to them by the Federal Constitution, by which they have the right to buy food, fuel, or other harmless necessaries of life, in any State they please, from anyone they choose, so long as their purchases are lawful in that State, although it is conceded the Federal Government can regulate, but not prohibit, the carriage of such necessaries to interstate markets.

Timber is a fuel, and Congress could not make a partial and unjust law discriminating between purchasers of timber fuel and purchasers of coal, or between stockholders and bondholders in common carriers owning timber lands and those owning coal lands, without violating the "due process of law" part of the Fifth Amendment, because there is no ground for exempting timber in the commodities clause, if it should apply to any fuel at all.

The only possible effect of the commodities clause upon coal is upon the mining or production thereof, if that clause is literally obeyed, hence it does not regulate interstate commerce,

it being a harmless and necessary commodity, but it undertakes to regulate its antecedent intrastate production, contrary to the Constitution and all such precedents.

MR. JUSTICE WHITE delivered the opinion of the court.

We dismiss for the present a contention made by one of the corporations that it is not a railroad company within the meaning of that term as used in the statute, which we shall have occasion to consider, because it is merely a coal company whose transporting operations are but incidental to its mining operations. With this contention put aside, it is true to say, speaking in a general sense, that the corporations, parties to this record, by means of railroads owned and operated by them, were engaged in transporting coal from the anthracite coal fields in Pennsylvania to points of market for ultimate delivery in other States. With much of the coal so transported the corporations had been or were connected by some relation distinct from the association which was necessarily engendered by the transportation of the commodity by the corporations as common carriers in interstate commerce. While the business of the corporations, generally speaking, had these characteristics, there were differences between them. Some of the corporations owned and worked mines and transported over their own rails in interstate commerce the coal so mined, either for their own account or for the account of those who had acquired title to the coal prior to the beginning of the transportation. Others, while operating railroads not only owned but also leased and operated coal mines, and carried the coal produced from such mines in the same way. Again, others of the railroad companies, although not operating mines, were the owners of stock in corporations engaged in mining coal, the coal so produced by such corporations being carried in interstate commerce by the railroad companies holding the stock in the producing coal companies, either for account of the producing corporations or for persons to whom the coal had been

sold at the point of production prior to the beginning of interstate commerce. This, moreover, was, additionally, the case as to some of the railroad companies who, as we have previously stated, were engaged both in the production of coal from mines owned by them and in interstate transportation of such product. All the attributes thus enjoyed by the corporations had been possessed by them for a long time and were expressly conferred by the laws of Pennsylvania, and, in some instances, also by the laws of other States, in which the companies likewise, in part, carried on their business. We insert in the margin a summary which the court below made concerning the situation of the respective corporations, taken from the answer or return made by each corporation.[1]

---

[1] It is admitted, generally, by the defendants, that the allegations in the bills and petitions, as to their corporate existence, are true, and that they own or operate railroads engaged in the interstate transportation of coal from the anthracite region of Pennsylvania. They also admit that this transportation has been carried on by the several defendants long prior to the 8th day of May, 1906, and in the case of some of them, for a period varying from a quarter to more than half a century prior thereto. In addition to these general admissions, detailed statements are made by the defendants, respectively, of the character and extent of the ownership or other interests possessed by them in the coal so transported, or in the lands or mines from which it is produced. It is only necessary to briefly summarize these statements:

(1) The Delaware & Hudson Company alleges that it directly owns its coal lands as it does its railroad; that it was incorporated by an act of the legislature of the State of New York, April 23, 1823, and was "authorized to construct a canal or water navigation from the anthracite coal district in Pennsylvania to the Hudson River in New York; to purchase lands in Pennsylvania containing stone or anthracite coal; and to employ its capital in the business of transporting to market coal mined from such lands." That this authority was also expressly conferred by acts of the legislature of the State of Pennsylvania, between the years 1823 and 1871, and that these acts of the State of Pennsylvania resulted from the desire and policy of said State to create and foster the industry of mining such coal and developing the transportation thereof; that under the authority of these statutes of Pennsylvania and of New York, the said defendant, beginning as early as the year 1825, invested its capital

After the first day of May, 1908, the Government of the United States commenced these proceedings by bill in equity against each of the corporations, to enjoin each from carrying

in the purchase of a large quantity of coal lands in the State of Pennsylvania and in the construction of canal navigation in Pennsylvania from the Delaware River to the Hudson River; that later, under statutes of both States, it invested additional capital in the construction of railroads, in the State of Pennsylvania, and in the construction and acquisition of railroads and leasehold estates in the State of New York, for the same general purpose of transporting coal from the coal lands owned by it; that it has invested large sums of money, not only in the acquisition of coal property, but in the erection of structures for mining and terminal facilities; that some of its coal properties were acquired under leases upon royalties payable to the lessors for each ton of coal mined; the leases fixing large minimum amounts by way of rent; that large fixed rentals are required to be paid, not only for those mining lands but for railroads acquired for the purpose of transporting coal; that there are three coal companies whose shares are practically all owned by it, viz., The Northern Coal & Iron Company, The Jackson Coal Company, and The Hudson Coal Company; that its mining lands thus owned and acquired are located upon or contiguous to the railroads of defendant; that said railroads are the only reasonable, practical, and conveniently available avenues of transportation whereby the coal by it produced can be transported in interstate commerce, and the coal mined by the defendant and by said coal companies upon its lines of railroad amounts approximately to 70 per cent of the entire transportation by it, or to about 4,300,000 gross tons, its daily shipments averaging about 12 trains of 37 coal cars each; that the coal lands so acquired by the defendant and by said three coal companies would have little, if any, value, except for the mining of coal therefrom and its sale as a commercial commodity, and that if it is deprived, by virtue of the said act of Congress, of the right to transport said coal, it will be deprived of the only possible enjoyment of its property. It further avers that it is not a "railroad company" within the meaning of the act of Congress, but that it is a coal company, and that since the year 1870 it has become, incidentally to its business as a coal mining company, a common carrier by railroad of passengers and property. It is further averred, as a special ground of defense by the said Delaware and Hudson Company, that this said "commodities clause" does not apply to it because all the coal mined by it upon its own lands, and upon the lands of the said three coal companies (except as to steam sizes,

in interstate commerce any coal produced under the circumstances which we have stated. At the same time a petition in mandamus was filed against each corporation, seeking to ac-

---

as thereafter stated) "is sold, before transportation thereof begins, by said company to third persons at the mines in Pennsylvania from which such coal has been produced, and that said company does not, at the time when the same is so transported by it in interstate commerce, own the same nor any interest therein, direct or indirect, apart from its obligation and rights as a common carrier in the transportation thereof, and that it carries said coal for the account of the purchaser thereof, who is the consignor and owner of said coal.

(2) "The answer of the Erie Railroad Company states that it was originally organized under the laws of the State of New York in 1832; that it has been reorganized from time to time under mortgage foreclosure; and finally, in November, 1895, under a foreclosure sale, it was reorganized under the statutes of New York, whereby it "became the lawful owner of the property, rights, privileges, immunities and franchises of all its predecessors aforesaid, including the shares of capital stock of coal companies and of railroad companies, as well as the railroads theretofore held and possessed by said predecessor companies, the railroads so owned by it and its said subsidiary companies having an aggregate mileage of over 2,100 miles in the States of New York, Pennsylvania, New Jersey, Ohio, Indiana and Illinois;" that the Pennsylvania Coal Company was created a corporation by the laws of Pennsylvania in 1838, its charter giving it the right of "transacting the usual business of companies engaged in mining, transporting to market, and selling coal and the other products of coal mined; " and for that purpose it was given the power to purchase or lease coal lands in Pennsylvania; also the power to construct railroads with one or more tracks. In 1853 the said Pennsylvania Coal Company was authorized to extend its railroad to connect with the New York & Erie Railroad. The right of said Pennsylvania Coal Company to buy coal lands and build railroad connections was continued by acts of the legislature of Pennsylvania in 1857, 1864, 1867 and 1868; that in pursuance of these various acts of the legislature, the Pennsylvania Coal Company obtained capital, issued stock therefor, acquired coal lands, developed coal mines, produced, transported to markets, and sold coal; built and operated railroads, made railway connections as authorized, and did other like acts to promote the business of supplying all persons needing the same with anthracite coal. The Hillside Coal & Iron Company was organized by an act of the legislature of the State of Pennsylvania in 1869 for the purposes and with powers similar to those

complish the same result. Both the equity causes and the mandamus proceedings were based upon the assumption that the first section of the act to regulate commerce, as amended

---

of the Pennsylvania Coal Company. Under authority of acts of the legislature of Pennsylvania the said Erie Railroad Company, long prior to the passage of said amendment to the interstate commerce act, acquired substantially all the capital stock of said Pennsylvania Coal Company, the Hillside Coal & Iron Company, the Jefferson Railroad Company, and Erie & Wyoming Railroad Company, and a small minority of the stock of the Temple Iron Company; and has pledged the same under various mortgages, pursuant to which have been issued and are now outstanding bonds for large sums, aggregating many millions of dollars, which bonds are held by purchasers in good faith and for value throughout the world; that for many years prior to May 1, 1908, it has been engaged in transporting the coal of said corporations to markets outside the State of Pennsylvania, many of which can only be reached from the railroad lines of this defendant; that the coal so transported amounts annually to several millions of tons and constitutes 22 per cent of the entire freight tonnage of this defendant, the Erie Company. It also denies that it is, by reason of the ownership of said stock in said companies, the owner in whole or in part, of the coal transported by it in interstate commerce, or that it has or had any interest, direct or indirect therein, and therefore has not violated or failed to comply with the so-called "commodities clause" of the interstate commerce act.

(3) The Central Railroad Company of New Jersey avers that it was organized under the laws of the State of New Jersey, and by these laws was authorized to purchase and hold the stock or securities of any other corporation, of New Jersey or elsewhere, and that it was also so authorized by two acts of assembly of the State of Pennsylvania, one of which, approved April 15th, 1869, was entitled "An act to authorize railroad and canal companies to aid in the development of coal, iron, lumber and other material interests of this Commonwealth;" that pursuant to the authority of these several acts, it had, long prior to the said act of Congress, become the owner of a majority of the shares of the capital stock of the Honeybrook Coal Company and of the Wilkesbarre Coal & Iron Company, both companies now being merged into the Lehigh & Wilkesbarre Company, a large majority of whose shares are owned by it; that it also owns a minority of the shares of the Temple Iron Company; that in 1871 it became the lessee of the Lehigh & Susquehanna Railroad, a Pennsylvania corporation, which it has ever since operated under an obligation to pay a yearly rental of not less than $1,414,400, and not

and reënacted by the law usually referred to as the Hepburn Act, approved June 29, 1906, c. 3591, 34 Stat. 584, contained a provision, generally known as the commodities clause, which

---

to exceed $2,043,300 per annum; that its gross earnings from the transportation of coal amounted, for the year ending June 7th, 1907, to $9,312,268.04, being 48 per cent of its entire freight receipts; and that a large part of its earnings from freight and miscellaneous passenger traffic is incident to and dependent upon the operation of the mines and collieries of said coal companies; and that the greater part of its earnings from transportation of coal comes from its carriage of the coal mined by the Lehigh & Wilkesbarre Coal Company; and that large sums of money have been expended by it in extending its lines and in constructions to enable it to transport said coal in interstate commerce.

(4) The Delaware, Lackawanna & Western Railroad Company, like the Delaware & Hudson Company, admits that it is the owner of coal lands and mines coal which it sells; that it was organized under an act of the legislature of Pennsylvania in 1849; that all the lines of railroad owned by it are wholly within the State of Pennsylvania, extending from the Delaware River, at the boundary line of the State of New Jersey, in a northwesterly direction across the State of Pennsylvania to the boundary line between the State of Pennsylvania and the State of New York, with a branch line extending from Scranton, in the State of Pennsylvania, to Northumberland, in said State. Said defendant also admits and alleges that, under express authority of acts of the legislature of the States of Pennsylvania, New Jersey, and New York, it, as lessee, now operates, and long prior to May 1st, 1908, has operated, various lines of railroad in the two last-mentioned States, by which it has direct traffic connection with the city of Buffalo and other cities in the said States. Defendant also admits that for many years it has owned in fee, extensive tracts of coal land in the State of Pennsylvania; that it has also leased large tracts of coal land in the said State, and is now engaged, and for many years last past has been engaged, in mining coal from the lands so owned and leased by it; that the holding of said lands, whether in fee or by lease, and the mining, manufacture, and interstate transportation of the coal therefrom, has been and continues to be, under and by virtue of the authority of the laws of the State of Pennsylvania.

That in addition to the foregoing, certain coal companies, organized from time to time under acts of assembly of the said State of Pennsylvania, have been merged into said defendant corporation; that by an act of the general assembly of the State of Pennsylvania, approved April 15th, 1869, entitled "An act to authorize railroad and canal companies

caused it to be illegal for the corporations after May 1, 1908, to
transport in interstate commerce coal with which the railroad
companies were or had been connected or associated in any of

to aid in the development of the coal, iron, lumber, and other material
interests of this Commonwealth," the defendant was authorized to aid
corporations authorized by law to develop coal, iron, lumber, and other
material interests of Pennsylvania, by the purchase of their capital stock
or bonds, or either of them. The answer of said defendant also alleges
that, by reason of its ownership of said coal lands and coal, and the reve-
nues derived from the transportation of the same to market, it has been
enabled to expend millions in the betterment of its general transporta-
tion facilities for both goods and passengers, and give to the public the
benefits of a well constructed and equipped modern railroad.

That by virtue of leases of railroads, to enable it to transport coal in
interstate commerce, it has become bound to pay yearly, in interest
charges, the sum of $5,155,697, and for taxes $1,163,916. That out of a
total of about 8,700,000 tons of coal produced by it in the year 1907 from
its lands owned in fee and leased, upwards of 6,700,000 tons were trans-
ported over its lines of railroad in interstate commerce; that from 40
per cent to 60 per cent of its annual transportation earnings, from the
operation of leased lines, has been derived from the carriage of its own
coal thereover.

That it uses, in the conduct of its business as a common carrier, ap-
proximately 1,700,000 tons of anthracite coal, of pea size or smaller, an-
nually, and will require more for such use in the future; that to obtain
this coal in these economic sizes it is necessary to break up coal, leaving
the larger sizes, which must be disposed of otherwise; that great waste
would result if it were forbidden to transport to market in interstate
commerce these larger sizes thus resulting.

That defendant's rights to acquire its holding of coal land, its rights
to own and mine coal and to transport the same to market in other
States as well as in Pennsylvania, and its leases of other railroads, were
acquired many years prior to the enactment of the so-called "Interstate
Commerce Act," and of the said amendment thereto known as the "com-
modities clause."

(5) The answer of the Pennsylvania Railroad Company avers that
it was incorporated under the laws of the State of Pennsylvania April
13th, 1846; that as early as 1871, under authority of two general statutes
of the State of Pennsylvania, it became the owner of all the shares of the
Susquehanna Coal Company, of all the shares of the Summit Branch
Mining Company, and of one-third of the shares of the Mineral Railroad

the modes above stated. Except as we have said, in the particular that one of the corporations claimed that it was not a railroad company within the meaning of the commodities

Mining Company, corporations of the State of Pennsylvania; that since the last-mentioned year, and up to the present time, it has carried the coal produced from the mines of the said coal companies, at lawfully established schedule rates, over its lines of railroad; that approximately 65 per cent of the coal so mined has been carried to destinations outside the State of Pennsylvania; that it mines no coal, but that the coal it carries is mined by the said coal companies, and that it has no interest therein within the meaning of the said act of Congress, either direct or indirect; that the most largely producing of the properties belonging to these coal companies are located either directly upon, or so contiguous to the system of railroads operated by said defendant, as to render transportation by any other railroads not reasonably practicable.

(6) The answer of the Lehigh Valley Railroad Company states that it was originally incorporated September 20th, 1847, under the laws of the State of Pennsylvania. Under the authority of various acts of assembly of the said State, other railroad and coal companies, prior to the year 1874, have been merged into it, some of which railroads were expressly authorized to construct railroads and to carry on the business of mining, transporting, and vending coal. It is also the lessee of railroads in Pennsylvania; that by means of its own and of said leased lines of railroad it conducts, and for many years has conducted, an interstate transportation of coal; that since 1872, pursuant to authority conferred by the laws of Pennsylvania, it has also owned the majority of the capital stock of the New York and Middle Coal Field Railroad and Coal Company, a corporation of the State of Pennsylvania; also the entire capital stock of Coxe Bros. & Company, a corporation of said State; a minority interest in the capital stock of the Highland Coal Company; a majority of the stock of the Locust Mountain Coal & Iron Company; a minority interest in the capital stock of the Packer Coal Company and of the Temple Iron Company, all corporations of the State of Pennsylvania, organized for the purpose of mining coal, some of them more than a half century ago; that it has constructed lines of railroad and branch railroads and terminal facilities for the purpose of transporting to market, in interstate commerce, the coal of the companies whose shares it owns, and this business has been conducted by it for many years; that practically said coal can be transported to market only by its railroads; that the capital stock of two of the coal companies owned by said defendant has been transferred to a trustee, to hold under a general mortgage executed by defend-

clause, they all defended substantially upon the ground that
when correctly interpreted the commodities clause did not for-
bid the interstate commerce traffic in coal by them carried on.
If it did, the clause was assailed as inherently repugnant to the
Constitution, because the right to enact it was not embraced
within the authority conferred upon Congress to regulate com-
merce. In addition it was contended that even if, abstractly
considered, the clause might be embraced within the grant of
power to regulate commerce, nevertheless its provisions were
in conflict with the due process clause of the Fifth Amend-
ment to the Constitution, because of the destructive effect
which the enforcement of its provisions would produce on the
rights of property which the corporations possessed and had
long enjoyed under the sanction of valid state laws. It was
besides insisted that in any event the clause was repugnant to
the Constitution, because of the discrimination caused by the
exception as to timber and the manufactured products thereof.
The cases were submitted on the pleadings, and were heard and
decided at one and the same time. Treating the clause as hav-
ing the meaning which the Government contended for, the
court came to consider the alleged repugnancy of the enact-
ment to the Constitution. In the principal opinion the subject

---

ant, under which mortgage bonds to the amount of $23,539,000 have
been issued by said defendant and are now outstanding in the hands of
the public; that the capital stock of Coxe Bros. & Company, Inc., owned
by this defendant as aforesaid, has been transferred and assigned to,
and is now held by, a trustee under a collateral trust agreement executed
by said defendant, dated November 1st, 1905, for the purpose and upon
the terms expressed in said agreement, a copy of which is annexed to
said answer, and that bonds to the amount of $18,000,000 have been
issued under said agreement and are now outstanding in the hands of
the public; that said defendant transports annually, in interstate com-
merce, upwards of 7,600,000 tons of anthracite coal, shipped by the said
coal companies whose stock is owned by said defendant, in whole or in
part as aforesaid, and transports annually for said coal companies, wholly
within the State of Pennsylvania, upwards of 1,500,000 tons; that nearly
42 per cent of its gross annual earnings of $36,068,431 for the last fiscal

was. at least formally approached, not for the purpose of deciding whether inherently the commodities clause was within the competency of Congress to enact as a regulation of commerce, but whether the provisions of that clause were repugnant to the Constitution because of the destructive effect of its prohibitions upon the vast sum of property rights which the corporations were found to enjoy as a result of valid state laws. In this aspect the issue which the court deemed it was called upon to determine was thus by it epitomized:

"The fundamental and underlying question, however, which presents itself at the threshold of all the cases for our consideration is whether the so-called commodities clause amendatory to the act to regulate commerce, passed June 29, 1906, so far as its scope applies by the universality of its language to the cases here presented, is in excess of the legislative authority granted to Congress by the Constitution. This question must be considered with reference to the Constitution as a whole and in relation to the agreed facts of the several cases. It is therefore necessary to keep in mind the situation as presented by these defendants, the facts set forth in their individual answers as above briefly summarized and the relevant industrial condi-

---

year, or $15,010,899, were derived from coal freights, which represented over 51 per cent of its entire freight tonnage; that the greater part of its gross earnings from coal transportation was received from the coal companies whose shares are by it owned; that the mines and collieries of said coal companies are all so located in the portions of the coal fields tributary to its lines of railroad that no means of transporting their product can be made available, except by defendant's railroads; that the railroad lines of this defendant have been from time to time extended, the control of other railroads acquired, and its facilities and equipment increased at enormous expense, in reliance upon the rights and franchises conferred by the statutes of Pennsylvania aforesaid; that a very large part of defendant's earnings is derived from the freight and passenger traffic incidental to and dependent upon the operation of the mines and collieries of said coal companies, and that if said defendant were deprived of the earnings derived from the transportation of the coal of said coal companies its business could not be continued, except at a net loss of many millions of dollars per annum.

tions which being matters of common knowledge may be judicially noticed."

The situation which it was considered should be kept in mind for the purpose of passing upon the constitutional question was thus stated:

"The general situation is that for half a century or more it has been the policy of the State of Pennsylvania, as evidenced by her legislative acts, to promote the development of her natural resources, especially as regards coal, by encouraging railroad companies and canal companies to invest their funds in coal lands, so that the product of her mines might be conveniently and profitably conveyed to market in Pennsylvania and other States. Two of the defendant corporations, as appears from their answers, were created by the legislature of Pennsylvania, one of them three-quarters of a century ago and the other half a century ago, for the expressed purpose that its coal lands might be developed and that coal might be transported to the people of Pennsylvania and of other States. It is not questioned that pursuant to this general policy investments were made by all the defendant companies in coal lands and mines and in the stock of coal-producing companies, and that coal production was enormously increased and its economies promoted by the facilities of transportation thus brought about. As appears from the answers filed, the entire distribution of anthracite coal in and into the different States of the Union and Canada for the year 1905 (the last year for which there is authoritative statistics) was 61,410,201 tons; that approximately four-fifths of this entire production of anthracite coal was transported in interstate commerce over the defendant railroads, from Pennsylvania to markets in other States and Canada, and of this four-fifths, from 70 to 75 per cent, was produced either directly by the defendant companies or through the agency of their subsidiary coal companies.

"It also appears from the answers filed that enormous sums of money have been expended by these defendants to enable them to mine and prepare their coal and to transport it to any

point where there may be a market for it.  It is not denied that the situation thus generally described is not a new one, created since the passage of the act in question, but has existed for a long period of years prior thereto, and that the rights and property interests acquired by the said defendants in the premises have been acquired in conformity to the constitution and laws of the State of Pennsylvania, and that their right to enjoyment of the same has never been doubted or questioned by the courts or people of that Commonwealth, but has been fully recognized and protected by both."

It was decided that, as applied to the defendants, the commodities clause was not within the power of Congress to enact as a regulation of commerce.  164 Fed. Rep. 215.  A member of the court dissented and expressed his reasons in a written opinion. Without adverting to all the reasoning expounded in that opinion, we think it accurate to say that in a large and ultimate sense it proceeded upon the assumption that, as the commodities clause provided, to quote the summing up of the opinion, for "the divorce of the dual relation of public carrier and private transporter," it was a regulation of commerce, and as such was within the power of Congress to enact, and when enacted was operative upon the defendants, and therefore required them to conform to the regulation, even although to do so might in some way indirectly affect valid rights derived from prior state legislation.

Judgments and decrees were entered denying the applications for mandamus and dismissing the bills of complaint.

The text of the commodities clause upon which the cases depend is as follows:

"From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport from any State, Territory, or the District of Columbia, to any other State, Territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in

whole or in part, or in which it may have any interest direct or indirect .except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a ·common carrier."

The Government insists that this provision prohibits railroad companies from transporting in interstate commerce articles or commodities other than the excepted class, which have been manufactured, mined or produced by them or under their authority, or which they own or may have owned in whole or in part, or in which they have or may have had any interest, direct or indirect. These prohibitions, it is further insisted, apply to the transportation by a railroad company in interstate commerce of a commodity which has been manufactured, mined or produced by a corporation, in which the transporting railroad company is a stockholder, irrespective of the extent of such. stock ownership. This construction of the provision rests not only upon the meaning which the Government insists should be given to its text, but on the significance of the text as illumined by what it is insisted was the result intended to be accomplished by the enactment of the clause. The purpose, it is contended, was not merely to compel railroad companies to dissociate themselves before transportation from articles or commodities manufactured, mined, produced or owned by them, etc., but moreover to divorce the business of transporting commodities in interstate commerce from their manufacture, mining, production, ownership, etc., and thus to avoid the tendency to discrimination, forbidden by the act to regulate commerce, which, it is insisted, necessarily inheres in the carrying on by a railroad company of the business of manufacturing, mining, producing or owning, in whole or in part, etc., commodities which are by it transported in interstate commerce.

The construction relied on is thus summed up in the argument of the Government: "It (the clause) forbids the carrier, who owns the mines and sells coal, to transport that coal in interstate commerce. . . . This is not trifling with the question. It states the exact fact and the reality." And, in

accordance with this principle, the insistence in argument is that it was the duty of the carrier who owned and worked coal mines, or who had stock in such mines, or who owned coal, in order to bring themselves within the law, to dispose absolutely of all their interest in coal-producing property, in whatever form enjoyed, and to cease absolutely from acquiring like rights in the future. It was, doubtless, because of the far-reaching effect of this construction upon the enormous property interests involved which caused the result of the provision to be thus stated in the argument for the Government: "This is undoubtedly a searching and radical law, and was meant to be so." True, the Government, in argument, suggests that the radical result of the statute may be assuaged, without violating its spirit, by limiting its prohibitions so as to cause them to apply only so long as the commodities to which it applies are in the hands of a carrier or its first vendee. But no such limitation is expressed in the statute, and to engraft it would be an act of pure judicial legislation. Besides, to do so would be repugnant to the asserted spirit and purpose of the statute which lies at the foundation of the construction upon which the Government relies.

Let us as a prelude to an analysis of the clause, for the purpose of fixing its true construction and determining the constitutional power to enact it when its significance shall have been rightly defined, point out the questions of constitutional power which will require to be decided if the construction relied upon by the Government is a correct one.

We at once summarily dismiss all the elaborate suggestions made in argument as to the alleged wrong to result from the enforcement of the clause, if it be susceptible of the construction which the Government has placed upon it. We do this because obviously mere suggestions of inconvenience or harm are wholly irrelevant, as they cannot be allowed to influence us in determining the question of the constitutional power of Congress to enact the clause.

Let it be conceded at once that the power to regulate com-

merce possessed by Congress is in the nature of things ever enduring, and therefore the right to exert it to-day, to-morrow and at all times in its plenitude must remain free from restrictions and limitations arising or asserted to arise by state laws, whether enacted before or after Congress has chosen to exert and apply its lawful power to regulate. For our present purposes, moreover, although we may have occasion to examine the subject hereafter, we entirely put out of view all the contentions based upon the assumption that even, although the provisions of the clause be in and of themselves lawful regulations of commerce, if prospectively applied, nevertheless they cannot be so considered, because of their retroactive effect upon the rights of the defendants alleged to have been secured by valid state laws. We further concede for the purpose of the inquiry we are at present making, although we may also have occasion to examine the subject hereafter, that the power of Congress to regulate commerce can be constitutionally so exerted as to compel a railroad company engaged in interstate commerce to dissociate itself in interest from the commodities which it transports in interstate commerce, even although by existing state laws the railroad company may have a lawful right of ownership or association with the commodity upon which the regulation operates.

With these concessions in mind, and despite their far-reaching effect, if the contentions of the Government as to the meaning of the commodities clause be well founded, at least a majority of the court are of the opinion that we may not avoid determining the following grave constitutional questions: 1. Whether the power of Congress to regulate commerce embraces the authority to control or prohibit the mining, manufacturing, production or ownership of an article or commodity, not because of some inherent quality of the commodity, but simply because it may become the subject of interstate commerce. 2. If the right to regulate commerce does not thus extend, can it be impliedly made to embrace subjects which it does not control, by forbidding a railroad company engaged in

interstate commerce from carrying lawful articles or commodities because, at some time prior to the transportation it had manufactured, mined, produced or owned them, etc.? And involved in the determination of the foregoing questions we shall necessarily be called upon to decide, (*a*) Did the adoption of the Constitution and the grant of power to Congress to regulate commerce have the effect of depriving the States of the authority to endow a carrier with the attribute of producing as well as transporting particular commodities, a power which the States from the beginning have freely exercised, and by the exertion of which governmental power the resources of the several States have been developed, their enterprises fostered, and vast investments of capital have been made possible? (*b*) Although the Government of the United States, both within its spheres of national and local legislative power, has in the past for public purposes, either expressly or impliedly, authorized the manufacture, mining, production and carriage of commodities by one and the same railway corporation, was the exertion of such power beyond the scope of the authority of Congress, or, what is equivalent thereto, was its exercise but a mere license, subject at any time to be revoked and completely destroyed by means of a regulation of commerce?

While the grave questions thus stated must necessarily, as we have said, arise for decision, if the contention of the Government, as to the meaning of the commodities clause be correct, we do not intend, by stating them, to decide them, or even in the slightest degree to presently intimate, in any respect whatever, an opinion upon them. It will be time enough to approach their consideration if we are compelled to do so hereafter, as the result of the further analysis, which we propose to make in order to ascertain the meaning of the commodities clause.

It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity.

*Knights Templars Indemnity Co.* v. *Jarman,* 187 U. S. 197, 205.
And unless this rule be considered as meaning that our duty is
to first decide that a statute is unconstitutional and then pro-
ceed to hold that such ruling was unnecessary because the
statute is susceptible of a meaning, which causes it not to be
repugnant to the Constitution, the rule plainly must mean that
where a statute is susceptible of two constructions, by one of
which grave and doubtful constitutional questions arise and by
the other of which such questions are avoided, our duty is to
adopt the latter.     *Harriman* v. *Interstate Com. Comm.,* 211
U. S. 407.

Recurring to the text of the commodities clause, it is ap-
parent that it disjunctively applies four generic prohibitions,
that is, it forbids a railroad carrier from transporting in inter-
state commerce articles or commodities, 1, which it has manu-
factured, mined or produced; 2, which have been so mined,
manufactured or produced under its authority; 3, which it
owns in whole or in part, and, 4, in which it has an interest,
direct or indirect.

It is clear that the two prohibitions which relate to manu-
facturing, mining, etc., and the ownership resulting therefrom,
are, if literally construed, not confined to the time when a
carrier transports the commodities with which the prohibitions
are concerned, and hence the prohibitions attach and operate
upon the right to transport the commodity because of the
antecedent acts of manufacture, mining or production.   Cer-
tain also is it that the two prohibitions concerning ownership, in
whole or in part, and interest, direct or indirect, speak in the
present and not in the past; that is, they refer to the time of the
transportation of the commodities.   These last prohibitions,
therefore, differing from the first two, do not control the com-
modities if at the time of the transportation they are not owned
in whole or in part by the transporting carrier, or if it then has
no interest, direct or indirect, in them.   From this it follows
that the construction which the Government places upon the
clause as a whole is in direct conflict with the literal meaning

of the prohibitions as to ownership and interest, direct or in-
direct. If the first two classes of prohibitions as to manu-
facturing, mining or production be given their literal meaning,
and therefore be held to prohibit, irrespective of the relation of
the carrier to the commodity at the time of transportation, and
a literal interpretation be applied to the remaining prohibitions
as to ownership and interest, thus causing them only to apply if
such ownership and interest exist at the time of transportation,
the result would be to give to the statute a self-annihilative
meaning. This is the case since in practical execution it would
come to pass that where a carrier had manufactured, mined
and produced commodities, and had sold them in good faith, it
could not transport them; but, on the other hand, if the carrier
had owned commodities and sold them it could carry them
without violating the law. The consequence, therefore, would
be that the statute, because of an immaterial distinction be-
tween the sources from which ownership arose, would pro-
hibit transportation in one case and would permit it in another
like case. An illustration will make this deduction quite clear:
A carrier mines and produces and owns coal as a result thereof.
It sells the coal to A. The carrier is impotent to move it for ac-
count of A in interstate commerce because of the prohibition of
the statute. The same carrier at the same time becomes a
dealer in coal and buys and sells the coal thus bought to the
same person, A. This coal the carrier would be competent to
carry in interstate commerce. And this illustration not only
serves to show the incongruity and conflict which would result
from the statute if the rule of literal interpretation be applied
to all its provisions, but also serves to point out that as thus
construed it would lead to the conclusion that it was the in-
tention, in the enactment of the statute, to prohibit manu-
facturing and production by a carrier and at the same time to
offer an incentive to a carrier to become the buyer and seller
of commodities which it transported.

But it is said, on behalf of the Government, in view of the
purpose of Congress to prohibit railroad companies engaged in

interstate commerce from being at the same time manu-
facturers, producers, owners, etc., of commodities which they
carry, despite the literal sense of some of the prohibitions they
should all be construed so as to accomplish the result intended,
and, therefore, their apparent divergence and conflict should
be removed by construing them all as prohibiting the trans-
portation because of the causes stated, irrespective of the par-
ticular relation of the railroad company to the commodities at
the time of transportation. This suggestion, however, simply
invites us, under the assumption that Congress had a particular
intention in enacting the clause, to so construe the clause as to
cause it to be essential to decide the grave constitutional ques-
tions which we have hitherto pointed out. On the contrary, as
the prohibitions concerning ownership in whole or in part, and
interest, direct or indirect, are susceptible only of the con-
struction that the dissociation of the carrier with the products
which it transports was contemplated, our duty is, if possible,
to treat the other and apparently conflicting prohibitions as
embracing a like purpose, and thus harmonize the provisions
of the clause and prevent the necessity of approaching and pass-
ing upon the grave constitutional questions which would neces-
sarily arise from pursuing the contrary course. This, it is urged,
cannot be done, since to do so would be in effect to expunge the
prohibitions against manufacturing, mining and production
from the clause, as ownership in whole or in part or interest,
direct or indirect, would embrace everything which could pos-
sibly have been intended to be expressed by the terms manu-
facturing, mining and production if the proposed reconciliation
of the conflict between the prohibitions be brought about.
We think, however, that a brief reference to a ruling of this
court concerning the effect of the Interstate Commerce Law,
prior to its amendment by the Hepburn Act, will serve to make
clear the unsoundness of the proposition. The case referred to
is that of the *New Haven Railroad* v. *Interstate Commerce Com-
mission*, 200 U. S. 361. In that case, after much consideration,
it was held that the prohibitions of the Interstate Commerce

Act as to uniformity of rates and against rebates operated to prevent a carrier engaged in interstate commerce from buying and selling a commodity which it carried in such a way as to frustrate the provisions of the act, even if the effect of applying the act would be substantially to render buying and selling by an interstate carrier of a commodity which it transported practically impossible. In thus deciding, however, it became necessary (pp. 399, 400) to refer to rulings of the Interstate Commerce Commission construing the act to regulate commerce, made not long after the enactment of the statute, in which it was held that where interstate commerce carriers were engaged in manufacturing, mining, producing and carrying commodities in virtue of state charters authorizing them so to do, granted prior to the enactment of the act to regulate commerce, that act could not be applied without confiscation, except in so far as the requirement of reasonableness of rates was concerned. While referring to those administrative rulings, and declaring that in view of their long standing the construction which had been thus given to the act should not be departed from, "at least until Congress has legislated on the subject" (p. 401), it was nevertheless plainly intimated that legislation which compelled a carrier, even although authorized by its charter before the passage of the act to regulate commerce to engage in the production as well as transportation of commodities, to dissociate itself before transportation from the products which it manufactured, mined or produced, would not, when enforced by proper rules and regulations, amount to confiscation. When, therefore, the subject of ownership, in whole or in part, or the interest of a carrier, direct or indirect, in the product which it transported, came to be considered, and the duty to dissociate before transportation came to be legislatively imposed, it is quite natural, in view of the prior administrative rulings and the intimations of this court, conveyed in the opinion in the *New Haven case*, to assume that the provisions as to manufacturing, mining and production, while they may be somewhat redundant, were nevertheless expressed

for the purpose of leaving no possible room for the implication that it was not the intention to include ownership resulting from manufacture, mining, production, etc., even although the right to manufacture, mine and produce was sanctioned by state charters prior to the enactment of the act to regulate commerce. Looking at the statute from another point of view the same result is compelled. Certain it is that we could not construe the statute literally without bringing about the irreconcilable conflict between its provisions which we had previously pointed out, and therefore some rule of construction is essential to be adopted in order that the statute may have a harmonious operation. Under these circumstances, in view of the far-reaching effect to arise from giving to the first two prohibitions a meaning wholly antagonistic to the remaining ones, we think our duty requires that we should treat the prohibitions as having a common purpose, that is, the dissociation of railroad companies prior to transportation from articles or commodities, whether the association resulted from manufacture, mining, production or ownership, or interest, direct or indirect. In other words, in view of the ambiguity and confusion in the statute we think the duty of interpreting should not be so exerted as to cause one portion of the statute which, as conceded by the Government, is radical and far-reaching in its operation if literally construed, to extend and enlarge another portion of the statute which seems reasonable and free from doubt if also literally interpreted. Rather it seems to us our duty is to restrain the wider, and as we think, doubtful prohibitions so as to make them accord with the narrow and more reasonable provisions, and thus harmonize the statute.

Nor is there force in the contention that because the going into effect of the clause was postponed for a period of nearly two years, therefore the far-reaching and radical effects which the Government attributes to the clause must have been contemplated by Congress. We think, on the contrary, it is reasonable to infer, in view of the facts disclosed in the statement which we have previously excerpted, that the delay accorded

is entirely consistent with the assumption that it was so granted to afford the time essential to make the changes which would be required to conform to the commands of the clause as we have interpreted it, such as providing the facilities for dissociation by sale at the point of production before transportation or segregation by means of the organization of *bona fide* manufacturing, mining or producing corporations.

It remains to determine the nature and character of the interest embraced in the words "in which it is interested directly or indirectly." The contention of the Government that the clause forbids a railroad company to transport any commodity manufactured, mined or produced, or owned in whole or in part, etc., by a *bona fide* corporation in which the transporting carrier holds a stock interest, however small, is based upon the assumption that such prohibition is embraced in the words we are considering. The opposing contention, however, is that interest, direct or indirect, includes only commodities in which a carrier has a legal interest, and therefore does not exclude the right to carry commodities which have been manufactured, mined, produced or owned by a separate and distinct corporation, simply because the transporting carrier may be interested in the producing, etc., corporation as an owner of stock therein. If the words in question are to be taken as embracing only a legal or equitable interest in the commodities to which they refer they cannot be held to include commodities manufactured, mined, produced or owned, etc., by a distinct corporation merely because of a stock ownership of the carrier. *Pullman Palace Car Co.* v. *Missouri Pacific R. R.*, 115 U. S. 587; *Conley* v. *Mathieson Alkali Works*, 190 U. S. 406. And that this is well settled also in the law of Pennsylvania is not questioned. It is unnecessary to pursue the subject in more detail, since it is conceded in the argument for the Government that if the clause embraces only a legal interest in an article or commodity it cannot be held to include a prohibition against carrying a commodity simply because it had been manufactured, mined or produced, or is owned by a corporation in

which the carrier is a stockholder.  The contention of the
Government substantially rests upon the assumption that un-
less the words be given the meaning contended for they are
without significance.  That this is clearly not the case is well
illustrated by the *New Haven case, supra.*  In that case the
Chesapeake and Ohio Railway Company it was shown at one
time not only directly engaged in buying, selling and transport-
ing coal, but subsequently, when a statute was passed in West
Virginia prohibiting such dealings, it resorted to indirect
methods for the continuance of its previous practice.  It may
well be that the very object of the provision was to reach and
render impossible the successful employment of methods of
the character referred to.  Certain it is, however, that in the
legislative progress of the clause in the Senate, where the clause
originated, an amendment in specific terms, causing the clause
to embrace stock ownership, was rejected, and immediately
upon such rejection an amendment, expressly declaring that
interest, direct or indirect, was intended, among other things, to
embrace the prohibition of carrying a commodity manufac-
tured, mined, produced or owned by a corporation in which a
railroad company was interested as a stockholder, was also
rejected.  1906, 40 Cong. Rec. pt. 7, pp. 7012–7014.  And the
considerations just stated we think completely dispose of the
contention that stock ownership must have been in the mind
of Congress, and therefore must be treated as though embraced
within the evil intended to be remedied, since it cannot in reason
be assumed that there is a duty to extend the meaning of a stat-
ute beyond its legal sense upon the theory that a provision which
was expressly excluded was intended to be included.  If it be
that the mind of Congress was fixed on the transportation by a
carrier of any commodity produced by a corporation in which
the carrier held stock, then we think the failure to provide for
such a contingency in express language gives rise to the impli-
cation that it was not the purpose to include it.  At all events,
in view of the far-reaching consequences of giving the statute
such a construction as that contended for, as indicated by the

statement taken from the answers and returns which we have previously inserted in the margin, and of the questions of constitutional power which would arise if that construction was adopted, we hold the contention of the Government not well founded.

We then construe the statute as prohibiting a railroad company engaged in interstate commerce from transporting in such commerce articles or commodities under the following circumstances and conditions: (*a*) When the article or commodity has been manufactured, mined or produced by a carrier or under its authority, and at the time of transportation the carrier has not in good faith before the act of transportation dissociated itself from such article or commodity; (*b*) When the carrier owns the article or commodity to be transported in whole or in part; (*c*) When the carrier at the time of transportation has an interest, direct or indirect, in a legal or equitable sense in the article or commodity, not including, therefore, articles or commodities manufactured, mined, produced or owned, etc., by a *bona fide* corporation in which the railroad company is a stockholder.

The question then arises whether, as thus construed, the statute was inherently within the power of Congress to enact as a regulation of commerce. That it was, we think is apparent, and if reference to authority to so demonstrate is necessary it is afforded by a consideration of the ruling in the *New Haven case,* to which we have previously referred. We do not say this upon the assumption that by the grant of power to regulate commerce the authority of the Government of the United States has been unduly limited on the one hand and inordinately extended on the other, nor do we rest it upon the hypothesis that the power conferred embraces the right to absolutely prohibit the movement between the States of lawful commodities or to destroy the governmental power of the States as to subjects within their jurisdiction, however remotely and indirectly the exercise of such powers may touch interstate commerce. On the contrary, putting these considerations en-

tirely out of mind, the conclusion just previously stated rests upon what we deem to be the obvious result of the statute as we have interpreted it; that it merely and unequivocally is confined to a regulation which Congress had the power to adopt and to which all preëxisting rights of the railroad companies were subordinated. *Armour Packing Co.* v. *United States*, 209 U. S. 56.

We think it unnecessary to consider at length the contentions based upon the due process clause of the Fifth Amendment. In form of statement those contentions apparently rest upon the ruinous consequences which it is assumed would be operated upon the property rights of the carriers by the enforcement of the clause interpreted as the Government construed it. For the purpose of our consideration of the subject it may be conceded, as insisted on behalf of the United States, that these contentions proceed upon the mistaken and baleful conception that inconvenience, not power, is the criterion by which to test the constitutionality of legislation. When, however, mere forms of statement are put aside and the real scope of the argument at bar is grasped, we think it becomes clear that in substance and effect the argument really asserts that the clause as construed by the Government is not a regulation of commerce, since it transcends the limits of regulation and embraces absolute prohibitions, which, it is insisted, could not be exerted in virtue of the authority to regulate. The whole support upon which the propositions and the arguments rest hence disappear as a result of the construction which we have given the statute. Through abundance of caution we repeat that our ruling here made is confined to the question before us. Because, therefore, in pointing out and applying to the statute the true rule of construction, we have indicated the grave constitutional questions which would be presented if we departed from that rule, we must not be considered as having decided those questions. We have not entered into their consideration, as it was unnecessary for us to do so.

Without elaborating, we hold the contention that the clause

under consideration is void because of the exception as to timber, and the manufactured products thereof, is without merit. Deciding, as we do, that the clause, as construed, was a lawful exercise by Congress of the power to regulate commerce, we know of no constitutional limitation requiring that such a regulation when adopted should be applied to all commodities alike. It follows that even if we gave heed to the many reasons of expedience which have been suggested in argument against the exception and the injustice and favoritism which it is asserted will be operated thereby, that fact can have no weight in passing upon the question of power. And the same reasons also dispose of the contention that the clause is void as a discrimination between carriers.

With reference to the contention that the commodities clause is void because of the nature and character of the penalties which it imposes for violations of its provisions, within the ruling in *Ex parte Young*, 209 U. S. 123, we think it also suffices to say that even if the delay which the clause provided should elapse between its enactment and the going into effect of the same does not absolutely exclude the clause from the ruling in *Ex parte Young*, a question which we do not feel called upon to decide, nevertheless the proposition is without merit, because, (a) no penalties are sought to be recovered in these cases, and, (b) the question of the constitutionality of the clause relating to penalties is wholly separable from the remainder of the clause, and, therefore, may be left to be determined should an effort to enforce such penalties be made.

There is a contention as to one of the defendants, the Delaware and Hudson Company, to which we, at the outset, referred, which requires to be particularly noticed. Under the charters granted to the company by the States of New York and Pennsylvania it was authorized to secure coal lands and mine coal, and, without going into detail, was originally authorized to construct a canal, and, ultimately, a railroad for the purpose of transporting, for its own account, the products of its mines, and, undoubtedly, vast sums of money have been in-

vested in carrying out these purposes. It is true also that the company is the owner of stock in various coal corporations. The claim now to be disposed of is that by the true construction of its charters the Delaware and Hudson Company is not a railroad company within the meaning of the term as used in the commodities clause, but is really a coal company. The contention, we think, is without merit. The facts stated in the excerpts from the answer and returns of the company, which we have previously placed in the margin, leave no doubt that the corporation was engaged as a common carrier by rail in the transportation of coal in the channels of interstate commerce, and as such we think it was a railroad company within the purview of the clause and subject to the regulations which are embodied therein as we have interpreted them.

As the court below held the statute wholly void for repugnancy to the Constitution, it follows from the views which we have expressed that the judgments and the decrees entered below must be reversed. As, however, it was conceded in the discussion at bar that in view of the public and private interests which were concerned, the United States did not seek to enforce the penalties of the statute, but commenced these proceedings with the object and purpose of settling the differences between it and the defendants, concerning the meaning of the commodities clause and the power of Congress to enact it as correctly interpreted, and upon this view the proceedings were heard below by submission upon the pleadings, we are of opinion that the ends of justice will be subserved, not by reversing and remanding with particular directions as to each of the defendants, but by reversing and remanding with directions for such further proceedings as may be necessary to apply and enforce the statute as we have interpreted it.

*And it is so ordered.*

MR. JUSTICE HARLAN, dissenting.

As these cases have been determined wholly on the construction of those parts of the Hepburn Act which are here in ques-

tion, and as Congress, if it sees fit, may meet that construction by additional legislation, I deem it unnecessary to enter upon an extended discussion of the various questions arising upon the record, and will content myself simply with an expression of my non-concurrence in the view taken by the court as to the meaning and scope of certain provisions of the act. In my judgment the act, reasonably and properly construed, according to its language, includes within its prohibitions a railroad company transporting coal, if, at the time, it is the owner, legally or equitably, of stock—certainly, if it owns a majority or all the stock—in the company which mined, manufactured or produced, and then owns, the coal which is being transported by such railroad company. Any other view of the act will enable the transporting railroad company, by one device or another, to defeat altogether the purpose which Congress had in view, which was to divorce, in a real, substantial sense, production and transportation, and thereby to prevent the transporting company from doing injustice to other owners of coal.