## EDWARDS, Internal Revenue Collector, v. WABASH RY. CO.

(Circuit Court of Appeals, Second Circuit.    February 18, 1920.)

No. 138.

1. **Corporations ⬚94—"Stock certificate" defined.**

A stock certificate is a document which is the evidence of the number of shares of stock which the holder of it owns.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Certificate of Stock.]

2. **Internal revenue ⬚19(1)—Tax not collectible on stock issued on conversion of other stock; "original."**

Under Act Oct. 3, 1917, § 800 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6318a), and Schedule A, imposing on each original issue, whether on organization or re-organization, of certificates of stock, a stamp tax of 5 cents on each $100 of face value or fraction thereof, the tax is imposed only on the original issue, the word "original" meaning first in order, and not on transfers of stock certificates, in which case a tax is imposed on the holder.   Hence a corporation organized in 1915, which had paid a tax of 5 cents for each $100 of face value of its total capital stock is not liable to further stamp tax on issuing, pursuant to articles of incorporation, certificates of stock which carried privilege of conversion into another form; according to the articles of incorporation, the issue not being original, and this conclusion being strengthened, in view of the construction which a similar stamp act had previously received.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Original.]

3. **Statutes ⬚219—Construction by departmental officers entitled to weight.**

A practical construction by departmental officers, whose duty it is to enforce a statute, is entitled to great influence, provided the statute presents an ambiguity which is real, and not captious.

4. **Internal revenue ⬚4—Stamp tax strictly construed.**

Statutes imposing a stamp tax on issues of stock certificates, not being remedial laws and not being founded on any permanent public policy, must be strictly construed, and to sustain the tax in any given case it must come clearly within the letter of the statute.

5. **Statutes ⬚225¾—Re-enactment of a statute construed adopts construction.**

Where a statute that has been construed by the courts is re-enacted in the same or substantially the same terms, the Legislature is presumed to have been familiar with its construction, and to have adopted it as part of the law, unless a different intent is indicated.

6. **Statutes ⬚225¾—Legislature presumed to adopt departmental construction of re-enacted statute.**

Where a statute which has been construed by an executive department of the government is subsequently re-enacted, the Legislature is presumed to have adopted previous departmental construction, and a subsequent departmental construction, contrary to the original one, is not entitled to weight.

7. **Statutes ⬚245—Ambiguity in tax statute must be resolved in favor of taxpayers.**

Where there is an ambiguity in the statute imposing a tax, such ambiguity must be resolved in favor of the taxpayer.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Wabash Railway Company against William H. Edwards, Collector of United States Internal Revenue for the Second

District of the State of New York. There was a judgment for plaintiff, and defendant brings error. Affirmed.

This cause comes here on writ of error to the United States District Court for the Southern District of New York. The defendant in error is hereinafter called plaintiff, and the plaintiff in error is hereinafter called defendant.

The plaintiff sues to recover the amount of stamp taxes demanded under the War Revenue Act of 1917 (40 Stat. 300), which it paid under protest. The plaintiff is a corporation organized under the laws of the state of Indiana. The amount of the original capital stock is fixed at $143,460,000, and the number of shares into which the capital is to be divided is fixed at 1,434,600 shares, of the par value of $100 each. Of such capital stock, 462,000 shares, it is provided in the certificate of incorporation, shall be issued as 5 per cent. profit-sharing preferred stock A, 499,700 shares shall be issued as 5 per cent. convertible preferred stock B, and 472,900 shares shall be issued as common stock.

The certificate of incorporation also provided that the "five per cent. profit-sharing preferred stock A shall be entitled to receive preferential dividends in each fiscal year up to the amount of 'five per cent. before any dividends shall be paid upon any other stock of this corporation, but such dividends on the five per cent. profit-sharing preferred stock A shall be noncumulative. After the payment or the setting apart in any one fiscal year of five per cent. dividends upon the five per cent. convertible preferred stock B and upon the common stock of this corporation, the five per cent. profit-sharing preferred stock A shall be entitled to receive additional dividends at the same rate per cent. as any further or additional dividends which may be declared in that year upon such common stock. The five per cent. profit-sharing preferred stock A shall, at the option of this corporation, be redeemable as an entirety at any time after December 1, 1920, upon twelve weeks' notice, at the price of one hundred and ten per cent. (110%) of its par value. In the event of any liquidation, dissolution or winding up (whether voluntary or involuntary) of this corporation, the holders of the five per cent. profit-sharing preferred stock A shall be entitled to be paid in full, out of the assets of this corporation, the par amount of their stock and all dividends thereon declared and unpaid, before any amount shall be paid out of said assets to the holders of any stock of this corporation; but after payment in full to the holders of the five per cent. convertible preferred stock B and common stock of this corporation of the par amount of their stock and all dividends thereon declared and unpaid, holders of all classes of stock of this corporation, without priority or distinction as between the different classes thereof, shall be entitled to participate pro rata in the remaining assets of this corporation."

"The five per cent. convertible preferred stock B shall be entitled to receive preferential dividends in each fiscal year up to the amount of five per cent. after payment of the full five per cent. dividends on the five per cent. profit-sharing preferred stock A, but before any dividends shall be paid upon the common stock of this corporation. Said dividends shall be noncumulative, and the five per cent. convertible preferred stock B shall not be entitled to any other or further dividends in any fiscal year. The holders of the five per cent. convertible preferred stock B may at any time after August 1, 1918, and up to thirty days prior to any date fixed for the redemption of the entire issue of five per cent. profit-sharing preferred stock A, convert the same into, and exchange the same for, five per cent. profit-sharing preferred stock A and common stock of this corporation. For the purpose of such conversion this corporation shall have power, from time to time, to issue such amounts of its five per cent. profit-sharing preferred stock A and common stock in addition to the amounts hereby specifically authorized as may be necessary. Such conversion shall be at the rate of fifty dollars ($50) par value of five per cent. profit-sharing preferred stock A and fifty dollars ($50) par value of common stock for each one hundred dollars ($100) par value of five per cent. convertible preferred stock B. with a proper adjustment of declared and unpaid dividends. The five per cent. convertible preferred stock B shall, at the option of this corporation, be redeemable as an entirety at any time after December 1, 1920,

upon twelve weeks' notice, at the price of one hundred and ten (110%) per cent. of its par value. In the event of any liquidation, dissolution or winding up (whether voluntary or involuntary) of this corporation, the holders of the five per cent. convertible preferred stock B shall be entitled to be paid in full, out of the assets of this corporation, the par amount of their stock and all dividends thereon declared and unpaid, before any amount shall be paid out of said assets to the holders of the common stock; but after payment in full to the holders of the common stock of the par amount of their common stock and all dividends thereon declared and unpaid, holders of all classes of stock of this corporation, without priority or distinction as between the different classes thereof, shall be entitled to participate pro rata in the remaining assets of this corporation."

The certificates of stock contained the following: "The holders of the five per cent. convertible preferred stock B may at any time after August 1, 1918, and up to thirty days prior to any date fixed for the redemption of the entire issue of five per cent. profit-sharing preferred stock A, convert the same into and exchange the same for five per cent. profit-sharing preferred stock A and common stock at the rate of fifty dollars ($50) par value of five per cent. profit-sharing preferred stock A and fifty dollars ($50) par value of common stock for each one hundred dollars ($100) par value of five per cent. convertible preferred stock B, with a proper adjustment of declared and unpaid dividends. In the event of any liquidation, dissolution or winding up (whether voluntary or involuntary) of the company: (1) The holders of the five per cent. profit-sharing preferred stock A shall be entitled to be paid in full out of the assets of the company the par amount of their stock and all dividends thereon declared and unpaid before any amount shall be paid out of said assets to the holders of any other stock of the company; (2) the holders of the five per cent. convertible preferred stock B shall then be entitled to be paid in full out of the assets of the company the par amount of their stock and all dividends thereon declared and unpaid before any amount shall be paid out of said assets to the holders of the common stock; (3) the holders of the common stock shall then be entitled to be paid in full out of the assets of the company the par amount of their stock and all dividends thereon declared and unpaid; and (4) thereafter the holders of all classes of stock of the company, without priority or distinction as between the different classes thereof, shall be entitled to participate pro rata in the remaining assets of the company. Holders of all shares of stock of the company have equal voting rights share for share alike. Reference is hereby made to the certificate of incorporation of the company, to all the provisions of which this certificate and the rights of the holder of stock represented hereby are subject, for a statement of the rights and privileges of and the limitations upon the various classes of the company's stock and of the obligations of the company with respect thereto and for its provisions generally as if herein set forth in full. The holder hereof by tne acceptance of this certificate assents to all of the provisions of said certificate of incorporation and consents to and authorizes such action as may be necessary to carry the same into effect."

The plaintiff prior to October 3, 1917, issued its capital stock in the par amount of $138,486,312.71, of which $46,200,000 was classified as five per cent. profit-sharing preferred stock A, $48,725,578.18 was classified as five per cent. convertible preferred stock B, and $43,559,743.43 was classified as common stock. Thereafter and on March 27, 1918, the board of directors adopted the following resolution:

"Resolved, that the proper officers of this company be and they are hereby authorized and directed to execute certificates for five per cent. profit-sharing preferred stock A and common stock of this company and to deliver and cause the same to be delivered in proper proportions, with a proper adjustment of declared and unpaid dividends, to holders of certificates for shares of this company's five per cent. convertible preferred stock B, who, at any time after August 1, 1918, and up to thirty days prior to any date fixed for the redemption of the entire issue of five per cent. profit-sharing preferred stock A, shall surrender the same for conversion into and exchange for five per cent. profit-sharing preferred stock A and common stock on the terms provided and set

forth in this company's certificate of incorporation and in the certificates for its five per cent. convertible preferred stock B."

The plaintiff, between August 2, 1918, and October 30, 1918, executed and delivered certificates representing 115,889 shares of five per cent. profit-sharing preferred stock A and the same number of common stock, in exchange for and conversion of 231,778 shares of five per cent. convertible preferred stock B.

The Commissioner of Internal Revenue ruled that the stock issued as stated in the preceding paragraph, by virtue of the right of conversion, was an original issue of stock and taxable as such under the provisions of section 800, schedule A of title VIII of the Act of October 3, 1917 (40 Statutes at Large, 319).

The plaintiff paid under protest the tax claimed by the government and this action is brought to recover the amount so paid. The defendant demurred, and the demurrer was overruled. Final judgment was ordered against the defendant for the sum of $11,588.90, that being the amount of the tax paid, with interest thereon from October 30, 1918, amounting to $537.21, together with the sum of $35.50 costs as taxed, in all the sum of $12,161.61.

Francis G. Caffey, U. S. Atty., of New York City (Vincent H. Rothwell, Asst. U. S. Atty., of New York City, of counsel), for plaintiff in error.

Winslow S. Pierce, Lawrence Green, and F. C. Nicodemus, Jr., all of New York City, for defendant in error.

Before WARD, ROGERS, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). [1-7] The question which this case presents arises under the War Revenue Act, approved on October 3, 1917, which is entitled "An act to provide revenue to defray war expenses, and for other purposes." 40 Statutes at Large, 300. The pertinent provisions of the act may be found in the margin.[1] The question is whether the certificates of A stock and common stock issued by the plaintiff in exchange for the B stock constituted such an issue of stock as to be subject to tax under the provisions of the act quoted in the margin. All the transactions with respect to the exchange of stock occurred during 1918, and therefore subsequent to the passage of the act. The certificates of stock

---

[1] "Title VIII—*War Stamp Taxes.*—Sec. 800. That on and after the first day of December, nineteen hundred and seventeen, there shall be levied, collected, and paid, for and in respect of the several bonds, debentures, or certificates of stock and of indebtedness, and other documents, instruments, matters, and things mentioned and described in schedule A of this title, or for or in respect of the vellum, parchment, or paper upon which such instruments, matters, or things, or any of them, are written or printed, by any person, corporation, partnership, or association who makes, signs, issues, sells, removes, consigns, or ships the same, or for whose use or benefit the same are made, signed, issued, sold, removed, consigned, or shipped, the several taxes specified in such schedule." Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6318a.

"Schedule A—*Stamp Taxes.* * * * 3. *Capital Stock, Issued.*—On each original issue, whether on organization or reorganization, of certificates of stock by any association, company, or corporation, on each $100 of face value or fraction thereof, 5 cents: Provided, that where capital stock is issued without face value, the tax shall be five cents per share, unless the actual value is in excess of $100 per share, in which case the tax shall be 5 cents on each $100 of actual value or fraction thereof.

"The stamps representing the tax imposed by this subdivision shall be attached to the stock books and not to the certificates issued."

issued in exchange for the stock previously issued are undoubtedly subject to the tax imposed, if they constitute certificates of original issue; the constitutionality of the statute being conceded.

The plaintiff company was organized in 1915, and its articles of association were filed in the office of the secretary of state of Indiana on October 22 of that year. It was incorporated, therefore, before the War Revenue Act was passed, and it paid the excise tax thereunder in respect of its entire original issue of capital stock, preferred A, preferred B, and common; the tax amounting to upwards of $70,000.

The plaintiff maintains that, as the conversion of the preferred stock B into the prescribed amounts of preferred stock A and common stock did not involve an increase of the capital stock of the company, but was merely a reclassification of certain existing stock pursuant to an arrangement perfected at the time of the organization of the company, the transaction did not involve an issue of "original" stock, and therefore was not taxable under the War Revenue Act.

The defendant insists that the transaction involved the issue of new certificates of the preferred stock A and of the common stock, and was an "original" issue of new stock never before in existence and subject to the stamp tax which was imposed. The defendant relies upon Treasury Decision 2752, containing, among others, the following ruling:

"The tax on the issue of capital stock attaches to the issue of certificates of stock representing stock never before issued, no matter when authorized. If a corporation issues preferred stock in place of common, or one kind of preferred stock in place of another kind of preferred stock, or stock without par value in place of stock with par value, the tax applies, even though the total outstanding stock is not thereby increased."

And it appears that Treasury Decision 2752 is, as we shall see, contrary to a series of decisions previously made under similar acts. In Robertson v. Downing, 127 U. S. 607, 8 Sup. Ct. 1328, 32 L. Ed. 269, the court in referring to a construction which the Treasury Department had placed on an act of Congress, said:

"The regulation of a department of the government is not of course to control the construction of an act of Congress when its meaning is plain. But when there has been a long acquiescence in a regulation, and by it rights of parties for many years have been determined and adjusted, it is not to be disregarded without the most cogent and persuasive reasons. United States v. Hill, 120 U. S. 169, 182 [7 Sup. Ct. 510, 30 L. Ed. 627]; United States v. Philbick, 120 U. S. 52, 59 [7 Sup. Ct. 413, 30 L. Ed. 559]; Brown v. United States, 113 U. S. 568, 571 [5 Sup. Ct. 648, 28 L. Ed. 1079]."

We may add that a construction placed by a department of the government upon an act of Congress ought not to be overturned, either by the department itself or by the courts, without cogent and persuasive reasons. The statement of the act of Congress herein involved is:

"3. *Capital Stock, Issue.* On each original issue, whether on organization or reorganization, of certificates of stock by any * * * corporation, * * * the tax shall be 5 cents per share."

This the defendant contends is a tax imposed on documents rather than on the transaction of which they may be a part. "Stamps are imposed, not on transactions, but on documents." And our attention

is called to a case, Malley v. Bowditch, 259 Fed. 809, —— C. C. A. ——, decided at the October term, 1918, by the Circuit Court of Appeals in the First Circuit, in which the court is said to have used this language:

"We are called upon to apply a statute imposing stamp taxes on documents of a certain class, and which assumes that these documents may be issued, not only by corporations, but by associations and companies. * * * The tax is not a franchise tax or a corporation tax, but a stamp tax or document tax."

We see no reason for doubting the accuracy of the above statement. We certainly have no intention of denying the proposition. But conceding it, as we do, it does not decide this case. The question remains whether the documents upon which the tax has been imposed are the evidence of an original issue of stock. A stock certificate is a document which is the evidence of the number of shares of stock which the holder of it owns. And the tax is laid, not on each stock certificate that is issued, but on each original issue of certificates. The language is used to indicate the first issuance of the stock, and this is emphasized by the use of the words, in the same connection, "whether on organization or reorganization." When a corporation issues for the first time a certificate of the stock, that certificate is an original issue. The tax is placed on the *original* issue. The word "original" is defined by Webster as "pertaining to the origin or beginning; preceding all; first in order." Plainly, then, it was not intended to tax the plaintiff on each issue of certificates, but only on each original issue of certificates which preceded all other issues which might subsequently be made, when the original certificates were surrendered and new ones issued in their place, either to the original owner or to those to whom the original owners had transferred them.

The taxation of such subsequent issues involving a change of title is provided for in section 4 of schedule A, title VIII, which imposes a tax on transfers, and imposes it, not on the company, but on the holder, and fixes the rate of the tax at 2 cents on each share having a face value of $100, instead of 5 cents, which is the rate imposed on the company in connection with the original issue.

The "issue" of stock generally means the issue of the certificates. The meaning of the word "issued" in connection with stocks, however, depends upon the connection in which it is used. Thus it has been held that stock is "issued and outstanding," within the meaning of a statute rendering stockholders personally liable, although the certificates therefor had not in fact been made out or delivered. Flour City Nat. Bank v. Shire, 88 App. Div. 401, 84 N. Y. Supp. 810, affirmed 179 N. Y. 587, 72 N. E. 1141. And in American Pig Iron Storage Co. v. State Board of Assessors, 56 N. J. Law, 389, 29 Atl. 160, the certificate of incorporation stated that the amount of the capital stock was to be $1,550,000, divided into 155,000 shares, of the par value of $100 each. The whole amount of the capital stock was subscribed. No certificates of stock had been given to the subscribers. Two assessments of 5 per cent. each on the subscriptions had been made by the company and paid by the subscribers. It was held that the company was liable to

taxation on the full amount of the stock subscribed for as capital stock "issued and outstanding" within the meaning of the tax law. The court said:

"The word 'issued,' as used in this connection, has no technical meaning. 'To issue,' as defined by lexicographers, signifies to send out; to put in circulation. In a popular sense, a corporation engaged in organization is said to issue stock when it obtains subscriptions for it, and in the construction of tax laws words are to be interpreted in their popular sense."

In the case at bar, when the plaintiff paid at the time of its organization the tax of 5 cents for each $100 of face value of its total capital stock, including the A stock, the B stock, and the common stock, such payment was made once for all, and constituted the payment of the tax on each original issue of the certificates of stock whenever and to whomsoever delivered. Whenever thereafter the plaintiff delivered the first certificates of the B stock, it was not under obligation to pay again the tax on the B certificates. That had been already done; and when, subsequently, the plaintiff exchanged the certificates of the B stock for certificates of the A stock and of the common stock, it was not bound to pay again the tax on the certificates. That tax, too, had been already paid. The exchange of stock was an exchange of original certificates of one kind of stock for original certificates of two other kinds of stock, the tax on all of which had been previously paid.

Attention has been called to the fact that defendant relies on Treasury Decision 2752. It is undoubtedly true that the construction placed upon a statute by the officers whose duty it is to execute it is entitled to great consideration from the courts in a doubtful case. A practical construction by public officers whose duty it is to enforce a statute is conceded to be entitled to great influence, provided the statute presents an ambiguity which is real, and not captious, one which is so serious as to raise a reasonable doubt in a fair mind. New York v. New York City R. Co., 193 N. Y. 543, 86 N. E. 565.

Revenue laws are strictly construed. Gould v. Gould, 245 U. S. 151, 38 Sup. Ct. 53, 62 L. Ed. 211; Spreckles Sugar Refining Co. v. McClain, 192 U. S. 397, 24 Sup. Ct. 376, 48 L. Ed. 496; Benziger v. United States, 192 U. S. 38, 24 Sup. Ct. 189, 48 L. Ed. 331; Eidman v. Martinez, 184 U. S. 578, 22 Sup. Ct. 515, 46 L. Ed. 697; American Net & Twine Co. v. Worthington, 141 U. S. 468, 12 Sup. Ct. 55, 35 L. Ed. 821; Hartranft v. Weigmann, 121 U. S. 609, 7 Sup. Ct. 1240, 30 L. Ed. 1012; United States v. Isham, 17 Wall. 496, 21 L. Ed. 728. In United States v. Wigglesworth, 2 Story, 369, Fed. Cas. No. 16,690, the rule was stated as follows:

"In the first place, it is, as I conceive, a general rule in the interpretation of all statutes levying taxes or duties upon subjects or citizens, not to extend their provisions, by implication, beyond the clear import of the language used, or to enlarge their operation so as to embrace matters not specifically pointed out, although standing upon a close analogy. In every case, therefore, of doubt, such statutes are construed most strongly against the government, and in favor of the subjects or citizens, because burdens are not to be imposed, nor presumed to be imposed, beyond what the statutes expressly and clearly import."

Statutes of this kind are not remedial laws, nor are they founded on any permanent public policy. They impose burdens upon the public and restrict the pursuit of occupations and the enjoyment of property. If a tax is to be sustained in any given case it must come clearly within the letter of the statute. It cannot be said that the transaction herein involved is clearly embraced in and covered by the statute. In Inland Revenue Commissioners v. Harrison, L. R. 7 H. L. 1, it was said that previous decisions should be followed especially in a fiscal matter where consistency' and certainty are of universal importance. The question raised in that case was as to the meaning of the Succession Duty Act, and Lord Cairns, emphasizing the importance of adhering to the construction previously given to the act in two decisions made by the House, said:

"It appears to me that it would be a most dangerous course for this House to adopt; and if it could be more dangerous in one case than in another, it would be so in a case in which your Lordships are dealing with one of the fiscal acts of the country, as to which the object must be, above that of all other acts, to maintain them and to expound them in a manner which will be consistent, and which will enable the subjects of this country to know what exactly is the amount of charge and burden which they are to sustain. I think that with regard to statutes of that kind, above all others, it is desirable, not so much that the principle of the decision should be capable at all times of justification, as that the law should be settled, and should, when once settled, be maintained without any danger of vacillation or uncertainty."

To impose an excise tax upon original issues of certificates of capital stock is not new in the fiscal legislation of the Congress. The Spanish War Revenue Act, approved June 13, 1898, (30 Statutes at Large, 458), imposed such a tax. Section 6 of the act and schedule A thereto may be found in the margin.[2] A comparison of this section and schedule with title VIII and schedule A of the present act, cited in the margin in an earlier part of this opinion, shows that the two enactments are substantially the same. The act of 1898 was repealed by an act of Congress approved on April 12, 1902. 32 Statutes at Large, 96. The precise question now presented under the present act arose under the prior act of 1898 and was submitted to the Treasury Department for a

---

[2] "Sec. 6. That on and after the first day of July, eighteen hundred and ninety-eight, there shall be levied, collected, and paid, for and in respect of the several bonds, debentures, or certificates of stock and of indebtedness, and other documents, instruments, matters, and things mentioned and described in schedule A of this act, or for or in respect of the vellum, parchment, or paper upon which such instruments, matters, or things, or any of them, shall be written or printed by any person or persons, or party who shall make, sign, or issue the same, or for whose use or benefit the same shall be made, signed, or issued, the several taxes or sums of money set down in figures against the same, respectively, or otherwise specified or set forth in the said schedule.

*　　*　　*　　*　　*　　*　　*　　*　　*　　*

"Schedule A. Bonds, debentures, or certificates of indebtedness issued after the first day of July, Anno Domini eighteen hundred and ninety-eight, by any association, company, or corporation, on each hundred dollars of face value or fraction thereof, five cents, and on each original issue, whether on organization or reorganization, of certificates of stock by any such association, company, or corporation, on each hundred dollars of face value or fraction thereof, five cents. *　*　*"

ruling. It appears that the Treasury Department at that time ruled that, if there had been no change of ownership, but merely a substitution in the hands of the same stockholder of certificates for one class of stock in lieu of certificates for another class, the transaction was not within the statute and was not taxable. T. D. 20,694, Feb. 7, 1899.

. At the outbreak of the European War the statute was again re-enacted in substantially the same form in the act of Congress approved on October 22, 1914, and which is known as the Emergency War Revenue Act. 38 Statutes at Large, 753. The Treasury Department, upon the passage of the act of 1914, issued a series of instructions to internal revenue officers in which it called attention to important rulings made under the act of 1898. Those instructions declared that, as the provisions of the Emergency War Revenue Act of 1914 embodied in schedule A thereof were identical with those of the earlier act, the rulings made by the department under the former act should be given great weight in considering the requirements of the later act, "as Congress in practically re-enacting the provisions of the earlier act must be considered to have done so in the light of the administrative construction given to that act." In one of its official circulars issued at that time the department directed specific attention to T. D. 20,694, which it summarized as follows:

"Preferred stock issued in lieu of common stock not taxable where there is no change of ownership." T. D. 2051, March 9, 1914."

It is a familiar and well-established rule that, where a statute that has been construed by the courts has been re-enacted in the same or substantially the same terms, the Legislature is presumed to have been familiar with its construction, and to have adopted it as a part of the law, unless a different intention is indicated; and the same principle is applied to statutes and parts of statutes which have been re-enacted after they have been construed by the legislative or executive departments of the government. The Supreme Court has decided that the re-enactment by Congress, without change, of a statute which had previously received long continued executive construction, is an adoption by Congress of such construction. United States v. G. Falk & Bros., 204 U. S. 143, 152, 27 Sup. Ct. 191, 51 L. Ed. 411; United States v. Cerecedo Hermanos y Compania, 209 U. S. 337, 339, 28 Sup. Ct. 532, 52 L. Ed. 821. We think that principle is applicable to the question herein involved. Congress, by re-enacting the act without substantial change in the provision now under consideration, adopted the construction which the Treasury Department for 15 years had placed upon it. We are under obligation to give to the act the interpretation which Congress intended it should have.

We may remark, further, what we think defendant must admit, that in view of the construction placed by the Treasury Department on similar acts in 1899 and in subsequent years, prior to Treasury Decision 2752 rendered August 14, 1918, overruling the earlier construction which held such an exchange of certificates not subject to tax, renders the question herein presented one of considerable doubt, and,

if doubtful, then the doubt must be resolved in the plaintiff's favor in accordance with the well-established rule that where there is an ambiguity in the language of a statute imposing a tax, and that ambiguity raises a doubt as to the legislative intent, the persons upon whom it is sought to impose the burden are to be given the benefit of the doubt.

Judgment affirmed.