**AMERICAN–LA FRANCE FIRE ENGINE CO., Inc., v. RIORDAN, Collector, etc.**

(Circuit Court of Appeals, Second Circuit. April 6, 1925.)

No. 159.

1. Evidence ⬦⬥5(2)—Importance of fire extinguishing and prevention judicially noticed.

Court will take judicial notice of the importance of fire extinguishing and prevention of spread of fire, and that it has become governmental function of more than private concern.

2. Internal revenue ⬦⬥11—"Fire engines" held not taxable as "automobiles" or "automobile trucks"; "motor vehicle"; "motor truck."

Fire engines are not taxable as "motor trucks" under Revenue Act of 1917, tit. 6, § 600 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6309¾a), and Revenue Act 1918, tit. 9, § 900 (Comp. St. Ann. Supp. 1919, § 6309⅘a), laying excise on automobiles, wagons, and motorcycles, in view of specification in statute of motor-driven vehicles, subject to tax, and avoidance of the term "motor vehicle," ordinarily used as the catch-all phrase, as in Acts Cong. Oct. 29, 1919, § 2 (Comp. St. Ann. Supp. 1923, § 10418c); March 3, 1909 (35 Stat. 693); July 26, 1911 (37 Stat. 6–8); July 3, 1918 (40 Stat. 761), July 21, 1914 (38 Stat. 522); March 3, 1915 (38 Stat. 899); April 17, 1917 (40 Stat. 7); and, in view of enactment of 1917, Act Aug. 31, 1918 (40 Stat. 939).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Motor Vehicle.]

3. Statutes ⬦⬥245 — Tax statutes construed most strongly against taxing power.

Provisions of statutes levying taxes will not be extended by implication beyond clear import of language, and, where doubt exists in construction, that most favorable to citizen and against taxing power will be adopted.

4. Constitutional law ⬦⬥48—Construction rendering statute constitutional will be adopted in preference to that rendering it unconstitutional.

If a statute will bear two constructions, that one which would make it within power of

lawmaking body will be adopted in preference to the construction making it unconstitutional.

In Error to the District Court of the United States for the Western District of New York.

Suit by the American-La France Fire Engine Company against Vincent H. Riordan, Collector, etc., for recovery of taxes paid under protest. Judgment for defendant (294 F. 567), and plaintiff brings error. Reversed.

Sackett, Chapman, Brown & Cross, of New York City (William P. Chapman, Jr., of New York City, of counsel), for plaintiff in error.

Richard H. Templeton, U. S. Atty., of Buffalo, N. Y. (Leland G. Davis, Asst. U. S. Atty., of Buffalo, N. Y., and Nelson T. Hartson and Charles T. Hendler, both of Washington, D. C., of counsel), for defendant in error.

Before ROGERS, MANTON, and HAND, Circuit Judges.

MANTON, Circuit Judge. This writ seeks to review a judgment dismissing an action to recover moneys paid under protest as excise taxes. Plaintiff in error is a manufacturer of motor-driven fire apparatus of various kinds, and sells principally to municipalities, but also to volunteer fire organizations. The fire apparatus consists of self-propelling vehicles, the engine of which is also used as a pumping engine. Some are constructed with aerial ladders and chemical engines, others with tractors, hook and ladders, and combination chemical engine and hook and ladders. There are three causes of action alleged for payments made by taxes assessed at different periods. The first relates to sales of fire apparatus which come within the Revenue Act of 1917. The second and third relate to sales made in April, 1919, and March, 1920, respectively, and are controlled by the Revenue Act of 1918. The Revenue Act of 1917 (section 600, title 6 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 6309¾a]) provides:

"That there shall be levied, assessed, collected, and paid—

"(a) Upon all automobiles, automobile trucks, automobile wagons, and motorcycles, sold by the manufacturer, producer, or importer, a tax equivalent to three per centum of the price for which so sold."

The Revenue Act of 1918 (section 900, title 9, of the Revenue Act of 1918, which went into effect as title 9, February 24, 1919 [Comp. St. Ann. Supp. 1919, § 6309⅘a]), provides as follows:

"Sec. 900. That there shall be levied, assessed, collected, and paid upon the following articles sold or leased by the manufacturer, producer, or importer, a tax equivalent to the following percentages of the price for which so sold or leased—

"(1) Automobile trucks and automobile wagons (including tires, inner tubes, parts, and accessories therefor, sold on or in connection therewith or with the sale thereof), 3 per centum;

"(2) Other automobiles and motorcycles (including tires, inner tubes, parts and accessories therefor, sold on or in connection therewith or with the sale thereof), except tractors, 5 per centum;

"(3) Tires, inner tubes, parts, or accessories, for any of the articles enumerated in subdivision (1) or (2), sold to any person other than a manufacturer or producer of any of the articles enumerated in subdivision (1) or (2), 5 per centum."

The questions presented are: First, whether fire apparatus, as described, sold to the state or political subdivision thereof for use in carrying on its governmental operations, is subject to this excise tax; and, second, whether self-propelled fire engines and other species of self-propelled fire apparatus as referred to in the complaint are taxable under either statute as automobile trucks or automobile wagons. Other subsidiary questions are presented, but we shall deal with these principal questions which will dispose of the cause.

It appears that from October, 1917, to May, 1918, there was no published regulation of the Treasury Department relating to the taxability under these statutes of sales to states and their political subdivisions. The plaintiff in error paid taxes on such sales under protest, but the amounts so paid were afterwards refunded. On May 31, 1918, the Commissioner of Internal Revenue published Regulation 44, art. 7, which announced that articles sold to a state or political subdivision thereof for use in carrying on its governmental obligation are not subject to the taxes. This remained effective until the Revenue Act of 1918 went into effect. Again, on May 5, 1919, Regulation 47 was published, which provided that articles sold to a state or political subdivision thereof by a manufacturer for use in carrying on its governmental operations was not subject to tax. And it was ruled that articles sold by a manufacturer to a state, county, or municipal institution were also exempt from tax when paid for entirely out of public moneys. On

July 22, 1919, by Treasury Decision 2897, it announced that "the tax also applies to the articles enumerated in this section, except to those enumerated in subdivision (10), when sold to a state or political subdivision thereof even though they are to be paid for entirely out of public moneys and are to be used in the carrying on of governmental operations."

[1, 2] This new regulation was made retroactive, and affected the sales here in question. However, on March 3, 1920, the department overruled its previous decisions, and held that fire apparatus, including fire engines, hose carts, hook and ladders, trucks, and water tower trucks, etc., were all taxable as automobile trucks and automobile wagons. This resulted in the collection of the tax here sought to be recovered. The effect of these rulings we need not consider in the view we take of this case.

It appears that there are seven types of machines involved for which a tax has been imposed and paid. It is argued that the main function of all of these types is to serve as apparatus or machines for putting out fire or for rescuing persons or property from fires, and that the transportation of persons or the transportation of property on these machines is not its primary use, but incidental to its primary use. It appears that the manufacture of fire apparatus is an industry that is separate from all other automobile manufacturing. In other words, the manufacturer of fire apparatus devotes his efforts exclusively to it. The finding below indicates that the amounts taxed on the type known as fire engines was $21,512.45 out of a total of $30,578.17. A feature of the self-propelled fire engine is the pump; the pump is connected with the motor by specially devised transmission. They are so constructed and integrated that they will function together properly so as to produce whatever pumping capacity is required. It is distinguished from the ordinary engine of the pleasure or commercial motorcar by having a much greater power and flexibility in high and second gear, and has an average capacity of from 700 to 750 gallons per minute at 120 pounds compression. It carries from six to eight men. The machines are designed and equipped to be used exclusively as fire-fighting apparatus, and are not primarily intended for use in the transportation of persons and property other than the machine itself and its appropriate equipment and crew. The type used with the aerial ladder provides a hoisting apparatus, which forms its attach-

ment with the engine. The aerial ladders are not removable, and this superstructure functions not only as a carrier, but also as a permanent holder of the separable instruments. The chemical engines have cylindrical chemical tanks which occupy primarily all of the available space above the frame outside of the driver's seat, and have neither the ordinary appearance nor the facility of trucks or wagons which are used for commercial purposes. The tractors are designed to be used in the propelling of aerial trucks, and are incapable of self-movement, unless the rear be supported. In the hook and ladders, the superstructure provides a permanent rack for the storing of the ladders. The ladder racks are provided with rollers, and the superstructure is so designed as to protect the ladders from injury. In the combination chemical engine and hook and ladders there is a chemical engine and a rack for carrying the hose for the chemical engine. They are constructed so as to obtain the speed of the average pleasure automobile. There are no seats except the driver's seat, but platforms upon which the firemen stand.

We should consider, first, whether or not these instruments or apparatus are instruments for fire fighting, or automobiles and motor wagons within the meaning of the two statutes in question. The etiology of fire engines is distinct from pleasure automobiles and commercial trucks. Fire engines, as such, have been referred to by that name for at least 200 years. They are referred to in the ancient statutes of England and the colonies of the United States and in the resolutions of city common councils passed before the adoption of the Constitution.[1] These and other statutes refer to the purchase and maintenance of fire engines or engines for the extinguishing of fire. See New International Encyclopedia. Between 1872 and 1879, self-propelled fire engines were purchased in the cities of Boston, New York, Brooklyn, Hartford, and Chicago. Therefore it would seem that the manufacture of self-propelled fire engines did not branch off

from the manufacture of pleasure automobiles and commercial trucks. The fire engine existed long before the automobile, and even the self-propelled fire engine had developed to a considerable degree of efficiency prior to the modern development of the automobile. The manufacture of pumping fire engines pre-existed the automobile. This art, however, borrowed and adopted to its own use the principal of automotive engineering which has been worked out in the manufacture of automobiles, but the manufacture of fire engines nevertheless continued to be, as it had been before, a separate industry carried on in separate manufacturing plants, and covered by manufacturing circumstances and functional requirements that in no way affected the automobile. The line of demarcation which separates the manufacture of fire apparatus from the manufacture in any other industry is unusually distinct. The total product of fire engines made in the United States is limited to a few concerns, and these are devoted exclusively to the manufacture of fire apparatus. Different engineering problems are encountered requiring differently schooled engineers. These factors and point of view of origin go far in determining that the self-propelled fire engine is an entirely different instrument from the automobile truck. The importance of fire extinguishing and prevention of the spread of fire is more than a private concern. It has become a governmental function. It is a matter of public importance. We may take judicial note of these facts. Holy Trinity Church v. United States, 143 U. S. 457, 12 S. Ct. 511, 36 L. Ed. 226; United States v. Laws, 163 U. S. 262, 16 S. Ct. 998, 41 L. Ed. 151. The conduct of a fire department is held by the overwhelming weight of authority in the state courts to be a governmental function. Dillon on Municipal Corporations (5th Ed.) § 34, note 3. And it may be considered as such under City of Trenton v. New Jersey, 262 U. S. 182, 43 S. Ct. 534, 67 L. Ed. 937, 29 A. L. R. 471. An automobile truck is a vehicle for the conveyance for commercial purposes over ordinary roads, and the average type of that kind of vehicle is especially designed both in its propelling mechanism and in its body construction for that function. But a fire fighting machine is an instrument of public utility designed and used exclusively for putting out fires, and the average or normal fire-fighting machine is in all its parts essentially designed for that purpose. It is a one utility machine. It is not applied to any other purpose. In the commercial truck or pleasure automobile, the

[1] Acts of the Parliament of England and of the common council of London in the year 1667; chapter 17 of the Laws of the Seventh year of Queen Anne (1708); ordinances of the common council of the city of New York, adopted May 6, 1731; Acts of the General Assembly of the Colony of New York; Act 6 of the Eleventh year of George II (1738); ordinances of the common council of the city of New York, adopted June 20, 1758; minutes of the common council of the city of New York, 1675–1776; Salem, Mass., 1749; Rhode Island, 1741–1756; Philadelphia, 1718.

basic and sole consideration is to apply motor power and transmission parts for propelling the vehicle along the road. In the design of the fire engine it is entirely different; the main basic consideration is the design of the pump and the motor to propel the pump when it is decided what capacity shall be pumped, and then design the pump transmission and the motor of the appropriate size and proportion to give that definite capacity which is fixed beforehand. The transportation of the machine is a secondary consideration. Indeed, the road work requirements are different than those of the commercial truck. It requires greater speed and usually a shorter haul. Thus the fire engine propels itself, its crew, and its equipment. Its runs are short and rapid. It possesses control mechanisms that are entirely absent from trucks.

Congress in enacting this taxing statute refrained from using the term "motor vehicle" or other catch-all phrase for the apparent reason that its intent could be more accurately conveyed by naming the four definite objects which it did name, and it seems to have had no intention to tax other objects in partial similitude of structure. In other enactments of Congress, as chapter 89, § 2, of the Laws of 1919 (Comp. St. Ann. Supp. 1923, § 10418c), "Larceny of motor vehicle," the term used is "motor vehicle," and the explanation of its meaning is said to include "an automobile, automobile truck, automobile wagon, motorcycle, or any other self-propelled vehicle not designed for running on rails." Congress delimited the field of taxation by specifying automobile, automobile truck, automobile wagon, and motorcycles. Congress had, before the passage of the taxing statutes in question, made use of the term "motor vehicles" as a generic term and the terms "automobiles" and "motor trucks" as designation of a species of objects included in the same generic term "motor vehicles." As in 1907–1909, the Sixtieth Congress (chapter 250, p. 693), provided an annual wheel tax on automobiles or other motor vehicles owned and operated in the District of Columbia and in the various appropriations of automobiles for the President and Vice President. And in the Act of July 26, 1911, c. 3 (37 Stat. pp. 6–8), it provided for duty ad valorem on "motor vehicles" other than railways and tramways and automobiles and parts thereof." The act of July 3, 1918, c. 130 (40 Stat. p. 761), provided appropriation for motor vehicles for carrying mails. Statutes which point out a distinction recognized by the Congress between motor vehicles and automobiles and also between automobiles and motor trucks, indicating that the latter are species of the genus motor vehicles, are illustrated by the following Act approved July 21, 1914, c. 191 (38 Stat. p. 522); Sixty-Third Congress, c. 80, p. 899, 1914–1915; Sixty-Fifth Congress, 1917, approved April 17, 1917, c. 3, p. 7. That Congress intended motor vehicles as its expression to include all kinds of motor-driven fire apparatus is supported by its language in chapter 164, p. 939, of the Enactment of 1917, 65th Congress. Judging from the use of phrase in these various enactments, Congress apparently intended motor vehicles to be a comprehensive term including all motor vehicles and motorcycles. When it used automobiles, as designating passenger vehicles, as distinguished from motor trucks, and repeatedly used both terms and also that of motorcycles for separate appropriations in the same statutes, all of which were aggregated under the term "motor vehicles," and, if it intended to tax fire apparatus, we would expect that it would use the term "motor vehicles or motor-driven fire apparatus," thus making its meaning clear.

[3] In the interpretation of statutes levying taxes, the rule is well established not to extend their provisions by implication beyond the clear import of the language employed or to enlarge the operation so as to embrace matters not specifically pointed out. Where doubt exists in construction, that construction is adopted which is most strongly against the taxing power and in favor of the citizen. Gould v. Gould, 245 U. S. 157, 38 S. Ct. 53, 62 L. Ed. 211; Eidman v. Martinez, 184 U. S. 578, 22 S. Ct. 515, 46 L. Ed. 697; American Net & Twine Co. v. Worthington, 141 U. S. 468, 12 S. Ct. 55, 35 L. Ed. 821; Edwards v. Wabash Ry. Co. (C. C. A.) 264 F. 610. The etymology of the word "automobile" is (Greek) auto, self, and (Latin) mobilis, movable. They are both broad, and are not of practical help. They might be considered anything that is self-moving. It may be used in reference to autos, locomotives, steamships, and airplanes, The dictionary definitions such as the Encyclopedia Americana, copyrighted 1918, says that "by far the larger number of all automobiles in use are employed for the transportation of persons, but the percentage used mainly for the transportation of goods is steadily increasing. * * * From these facts it follows that the automobile intended for the transportation of persons and driven by means of gasoline burned in an automobile engine is the dominant type. It is to

this type that the word automobile is applied without the use of additional qualifying terms."

In "Huddy on the Law of Automobiles," p. 2, the author says: "Primarily the word means a vehicle designed mainly for transportation of persons on highways, equipped with an internal combustion, hydrocarbon vapor engine, which furnishes the motive power and forms a structural portion of the vehicle. Secondarily, it is used as synonymous with 'motor vehicle,' denoting a vehicle moved by inanimate power of any description, generated or stored within it, and intended for the transportation of either goods or persons on common highways."

Bouvier's Law Dictionary, at page 294, refers to it as a vehicle for the carriage of passengers or freight propelled by its own motor.

It is argued by the defendant in error that an automobile truck is readily convertible into a fire engine, and it is also argued that a fire engine may be converted into a truck. An examination of the evidence shows that the expense of converting an automobile truck into a fire engine exceeds the tax placed thereon many times. It does appear that a chassis of an automobile truck is used in the production of a fire-fighting apparatus, but this is not done by an ordinary mechanic. When it is done, some changes and adaptations even in the chassis itself are required. It is necessary to design the equipment and fit it to the particular use.

We think these were factors which were determinative of Congress refusing to place a tax upon fire engines or apparatus used by fire departments, and this, we think, applies to fire apparatus used by municipalities and volunteer associations in small communities.

[4] Indeed, a ruling that the fire apparatus and fire engines are taxable under the statute would present the question of the constitutionality of the tax. And, if a statute will bear two constructions, one within and the other without the constitutional power of the lawmaking body, the court should adopt that which is consistent with the Constitution because it is to be presumed that the Legislature intended to act within the scope of its authority. St. Louis-Southwestern Ry. Co. v. Arkansas, 235 U. S. 350, 35 S. Ct. 99, 59 L. Ed. 265; U. S. ex rel. Atty. Gen. v. Delaware & Hudson Co., 213 U. S. 366, 29 S. Ct. 527, 53 L. Ed. 836. Such a constitutional question would be presented if we held these taxing statutes applicable here. In the case at bar the tax is both incurred

and measured by governmental transactions in the purchase and use of the fire engines or apparatus. The rule that the operations of each of our two systems of government are beyond the taxing power of the other applies not only to excise taxes, but to all taxes of whatever kind, and it is manifest that exemption of state agencies or municipal agencies from federal taxation is dependent, not upon the nature of the agencies or upon the mode of their constitution or upon the fact that they are agents, but upon the effect of the tax. If fire fighting as such is a governmental function, the taxing of the instrumentalities necessary for the performance of that governmental function such as a fire engine or apparatus presents the question of whether or not Congress has the power to impose a tax, and whether the municipality or state is immune from such taxing in the purchase of such instrumentality. Railroad Co. v. Peniston, 18 Wall. 5, 21 L. Ed. 787; Fidelity & Deposit Co. v. Pennsylvania, 210 U. S. 319, 36 S. Ct. 298, 60 L. Ed. 664.

Taking the view that we do, that it was not the intent of Congress to include within the statutory enactment fixing the tax fire apparatus or fire engines, we need not decide this constitutional question. It is sufficient to say that Congress did not include such apparatus or fire engines within the taxing statutes.

Judgment reversed.